# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 21, 2012          Decided June 5, 2012

No. 11-5174

ASSOCIATION OF PRIVATE SECTOR COLLEGES AND
UNIVERSITIES,
APPELLANT

v.

ARNE DUNCAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE DEPARTMENT OF EDUCATION AND THE UNITED STATES
DEPARTMENT OF EDUCATION,
APPELLEES

Consolidated with 11-5230

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cv-00138)

*Douglas R. Cox* argued the cause for appellant/cross-appellee. With him on the briefs were *Timothy J. Hatch*, *Nikesh Jindal*, and *Derek S. Lyons*.

*Joshua Waldman*, Attorney, U.S. Department of Justice, argued the cause for appellees/cross-appellants. With him on the briefs were *Tony West*, Assistant Attorney General, *Ronald C. Machen, Jr.*, U.S. Attorney, and *Michael S. Raab*, Attorney.

Before: ROGERS, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Every year, Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education. The Department of Education ("the Department" or "the agency") administers these programs, which were established under Title IV of the Higher Education Act of 1965 ("the HEA" or "the Act"), Pub. L. No. 89-329, 79 Stat. 1219, 1232–54. Students must repay their federal loans; the costs of unpaid loans are borne by taxpayers.

To participate in Title IV programs – *i.e.*, to be able to accept federal funds – a postsecondary institution ("a school" or "an institution") must satisfy several statutory requirements. These requirements are intended to ensure that participating schools actually prepare their students for employment, such that those students can repay their loans. Three requirements are at issue here. First, a school must qualify as an "institution of higher education," 20 U.S.C. § 1094(a) (2006) – meaning, *inter alia*, that the school is "legally authorized" to provide education in the state in which it is located, *id.* § 1001(a)(2). Second, a school must "enter into a program participation agreement with the Secretary" of Education ("the Secretary"), pursuant to which the school agrees, *inter alia*, not to "provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any" recruiters or admissions employees. *Id.* § 1094(a)(20). Third, a school must not engage in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." *Id.* § 1094(c)(3)(A).

In 2009, based on experiences that it had faced in

administering the Title IV programs, the Department concluded that the existing regulations covering the state authorization, compensation, misrepresentation, and other statutory requirements created opportunities for abuse by schools, because the regulations were too lax. The Department thus initiated a rulemaking process to strengthen the regulations so as to protect the integrity of these programs. On October 29, 2010, following notice and comment, the agency issued final regulations.

The new regulations included several new provisions that are the focus of the dispute in this case. First, the Department adopted for the first time substantive regulations addressing the HEA's state authorization requirement. *See* 34 C.F.R. § 600.9 (2011) ("the State Authorization Regulations"). Under the applicable regulations, a school is now legally authorized by a state, only if the state has a process to review and act on complaints concerning institutions, and if the state has authorized that specific school by name. *See id.* § 600.9(a)(1)(i)(A) ("the school authorization regulation"). In addition, in order to be "legally authorized," a school offering distance or correspondence education, including online courses, must obtain authorization from all states in which its students reside that require such authorization. *See id.* § 600.9(c) ("the distance education regulation"). Second, the regulations covering compensation practices were amended to eliminate regulatory "safe harbors" pursuant to which schools had adopted compensation practices that effectively circumvented the HEA's proscription against certain incentive payments. *See id.* § 668.14(b)(22) ("the Compensation Regulations"). Finally, the Department amended the regulations covering the HEA's misrepresentation requirement, *see id.* §§ 668.71–.75 ("the Misrepresentation Regulations"), by, *inter alia*, specifying that a "misleading statement includes any statement that has the likelihood or tendency to deceive or confuse," *id*. § 668.71(c), and restyling the Secretary's menu of enforcement options, *see id*. § 668.71(a).

The Association of Private Sector Colleges and Universities ("Appellant" or "the Association") filed suit in the District Court challenging the State Authorization, Compensation, and Misrepresentation Regulations (collectively, "the challenged regulations") under the Administrative Procedure Act ("the APA"), *see* 5 U.S.C. § 706 (2006), and the Constitution. Both parties moved for summary judgment. The District Court granted summary judgment to the Department on Appellant's challenges to the Compensation and Misrepresentation Regulations; found that Appellant lacked standing to challenge the school authorization regulation; and granted summary judgment to Appellant on its challenge to the distance education regulation. *See Career Coll. Ass'n v. Duncan*, 796 F. Supp. 2d 108 (D.D.C. 2011).

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. First, we affirm the judgment of the District Court holding that the Compensation Regulations do not exceed the HEA's limits. And we mostly reject Appellant's claim that these regulations are not based on reasoned decisionmaking. We remand two aspects of the Compensation Regulations, however, that are lacking for want of adequate explanations. Second, we hold that the Misrepresentation Regulations exceed the HEA's limits in three respects: by allowing the Secretary to take enforcement actions against schools sans procedural protections; by proscribing misrepresentations with respect to subjects that are not covered by the HEA; and by proscribing statements that are merely confusing. We reject Appellant's other challenges to the Misrepresentation Regulations. Finally, with respect to the State Authorization Regulations, we conclude that Appellant has standing to challenge the school authorization regulation, but hold that the regulation is valid. However, we uphold Appellant's challenge to the distance education regulation, because that regulation is not a logical outgrowth of the Department's proposed rules.

## I.   Background

### A.  The Higher Education Act

Congress created the Title IV programs to foster access to higher education.  "Every year [these] programs provide more than $150 billion in new federal aid to approximately fourteen million post-secondary students and their families."  *Career Coll. Ass'n*, 796 F. Supp. 2d at 113–14.  Students receiving this aid attend private for-profit institutions, public institutions, and private nonprofit institutions. *See id.* at 114.  These students are expected to repay their federal loans; their failure to do so shifts their tuition costs onto taxpayers.  But schools receive the benefit of accepting tuition payments from students receiving federal financial aid, regardless of whether those students are ultimately able to repay their loans.  Therefore, Congress codified statutory requirements in the HEA to ensure against abuse by schools.  Three are at issue in this dispute.

First, the HEA stipulates that "[i]n order to be an eligible institution for the purposes of any [Title IV] program[,] . . . an institution must be an institution of higher education."  20 U.S.C. § 1094(a).  Federal law defines an "institution of higher education" as an institution in any state that *inter alia* "is legally authorized within such State to provide a program of education beyond secondary education."  *Id.* § 1001(a)(2); *see also id.* § 1002(a)(1), (b)–(c).  The HEA does not define "legally authorized."  This lack of a statutory definition has meant that, for virtually all of the HEA's history, each state has determined for itself the method of authorizing schools within its borders.

Second, as noted above, each school must enter into a program participation agreement with the Secretary.  Pursuant to this statutory requirement, a school must agree not to "provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student

recruiting or admission activities or in making decisions regarding the award of student financial assistance." *Id.* § 1094(a)(20). Congress adopted this provision in 1992 based on its concern that schools were creating incentives for recruiters to enroll students who could not graduate or could not find employment after graduating. *See* H.R. REP. NO. 102-447, at 10 (1992), *reprinted in* 1992 U.S.C.C.A.N. at 343; *see also United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 989 (9th Cir. 2011) ("This requirement is meant to curb the risk that recruiters will sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." (citations omitted) (internal quotation marks omitted)). The Department may initiate an enforcement action against a school that violates this prohibition to seek the imposition of a civil fine or the limitation, suspension, or termination of the institution's eligibility to participate in Title IV programs. *See* 20 U.S.C. § 1094(c)(1)(F), (c)(3)(B)(i)(I).

Third, the HEA prohibits schools from engaging in "substantial misrepresentation" regarding "the nature of its educational program, its financial charges, or the employability of its graduates." *Id.* § 1094(c)(3)(A). Congress adopted this provision to protect students from "false advertising" and other forms of manipulative "sharp practice." H.R. REP. NO. 94-1086, at 13 (1976). If the agency determines "after reasonable notice and opportunity for a hearing" that an institution has engaged in proscribed substantial misrepresentation, it may "suspend or terminate" the institution's eligibility to participate in Title IV programs. 20 U.S.C. § 1094(c)(3)(A). The agency may alternatively seek the imposition of a civil fine. *See id.* § 1094(c)(3)(B)(i)(II).

## B. Regulatory History

Congress has delegated to the Secretary the authority to promulgate regulations governing the Department's

administration of Title IV and other federal programs. The grant of authority provides that "[t]he Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." *Id.* § 1221e-3; *see also id.* § 1098a(a)(1) (directing the Secretary to obtain public involvement in the development of regulations through negotiated rulemaking). In 2009, the Secretary established a negotiated rulemaking committee to develop new rules related to its administration of Title IV programs. *See* Department of Education, Negotiated Rulemaking Committees; Establishment, 74 Fed. Reg. 24,728 (May 26, 2009).

The reason for the Department's new regulations is clear. The agency had determined that the existing regulations were too lax, allowing schools to circumvent the proscriptions of the HEA and threaten the integrity of Title IV programs. For example, following an investigation, agency officials found that the University of Phoenix had "systematically engage[d] in actions designed to mislead the [Department] and to evade detection of its improper incentive compensation system for those involved in recruiting activities." Letter from Donna M. Wittman, Institutional Review Specialist, to Todd S. Nelson, President, Apollo Grp., Inc. (Feb. 5, 2004) ("Phoenix Report"), *reprinted in* J.A. 145. The Department ultimately chose to settle with the university's parent company rather than to pursue a formal sanction, but allegations of impropriety continued. *See* Stephen Burd, *More Scrutiny Needed of the University of Phoenix's Recruiting Practices*, HIGHER ED WATCH (Feb. 19, 2009), http://www.newamerica.net/blog/higher-ed-watch/2009/more-scrutiny-needed-university-phoenix-10193, J.A. 258.

Nor did the Department have any reason to believe that the University of Phoenix's alleged misconduct was aberrational.

In 2007, admissions and financial aid employees filed a *qui tam* false claims action against Alta Colleges, alleging that the organization had, in contravention of the HEA, both misrepresented the nature of its degrees to prospective students and provided salary increases and bonuses to recruiters based solely on the number of students they recruited. *See* Third Amended False Claims Compl. ¶¶ 2–12, 21–25, 28–43, 44–53, Dec. 20, 2007, J.A. 200–201, 203–04, 205–07, 208–09. A former recruiter filed a similar action against DeVry in 2009. *See* First Amended Compl. Dec. 31, 2008, J.A. 232. There were also media reports during this period indicating that other schools had engaged in compensation and marketing practices proscribed by the HEA. *See, e.g.*, Rebecca Leung, *For-Profit College: Costly Lesson*, CBSNEWS (Jan. 30 2005), http://www.cbsnews.com/stories/2005/01/31/60minutes/main 670479.shtml, J.A. 192.

The Secretary's negotiated rulemaking committee failed to reach consensus. *See* Department of Education, Program Integrity Issues, Notice of Proposed Rulemaking ("NPRM"), 75 Fed. Reg. 34,806, 34,807–08 (June 18, 2010). The Department moved forward, however, and submitted proposed regulations for public comment. *See id.* at 34,806. "Approximately 1,180 parties submitted comments" during the comment period. Department of Education, Program Integrity Issues, Final Regulations ("Final Regulations"), 75 Fed. Reg. 66,832, 66,833 (Oct. 29, 2010). The Department issued its final regulations on October 29, 2010. *See id.*

## C. The Challenged Regulations

### 1. The State Authorization Regulations

The Department's 2002 regulations did not impose any substantive rules covering state authorization. Before the promulgation of the new regulations, states determined for themselves the methods of authorizing schools. But the new

regulations eliminate the old regime and require states to follow specified standards in order to satisfy the HEA's state authorization requirement. Two are at issue here.

First, the school authorization regulation applies to all institutions participating in Title IV programs. It establishes that

> [a]n institution . . . is legally authorized by a State if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws, and the institution . . . is established by name as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity and is authorized to operate educational programs beyond secondary education.

34 C.F.R. § 600.9(a)(1)(i)(A) (2011).

Second, the new regulations include a provision covering providers of distance education. It sets forth that

> [i]f an institution is offering postsecondary education through distance or correspondence education to students in a State in which it is not physically located or in which it is otherwise subject to State jurisdiction as determined by the State, the institution must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State.

*Id.* § 600.9(c).

2. The Compensation Regulations

The Department's 2002 regulations allowed schools to engage in specific compensation practices under a series of safe harbors. As the Department explained in its 2002 rulemaking, the safe harbors were created to "clarify the current law for most institutions by setting forth specific payment arrangements that

an institution may carry out that have been determined not to violate the incentive compensation prohibition in" the HEA. Department of Education, Federal Student Aid Programs, Final Regulations, 67 Fed. Reg. 67,048, 67,053 (Nov. 1, 2002). In 2010, the Department eliminated the codified safe harbors and expressly interpreted the HEA to prohibit some of the practices that had previously been deemed safe. Of the compensation arrangements that were previously permitted and are now prohibited, three are at issue.

First, the 2002 regulations allowed schools to provide salary adjustments – *e.g.*, raises – to persons engaged in recruiting and admission activities, so long as those adjustments were not made "more than twice during any twelve month period" and were not "based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2010) (emphasis added). In contrast, the current Compensation Regulations prohibit institutions from offering any "sum of money or something of value, other than a fixed salary or wages," 34 C.F.R. § 668.14(b)(22)(iii)(A) (2011), "based *in any part, directly or indirectly*, upon success in securing enrollments or the award of financial aid," *id.* § 668.14(b)(22)(i) (emphasis added). In other words, under the Compensation Regulations, an institution may a make merit-based salary adjustment to a recruiter's salary, but only if the adjustment is not based in any part, directly or indirectly, on the recruiter's success in securing either enrollments or the award of financial aid. *See id.* § 668.14(b)(22)(ii)(A).

Second, the 2002 regulations allowed schools to provide incentive based compensation to employees "based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E) (2010). The Department eliminated this safe harbor.

Third, the 2002 regulations allowed schools to provide

incentive based compensation "to managerial or supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admission activities, or the awarding of title IV, HEA program funds." *Id.* § 668.14(b)(22)(ii)(G). The Department eliminated this safe harbor. Moreover, it interpreted the HEA's prohibition – which applies to "persons . . . engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance," 20 U.S.C. § 1094(a)(20) – to reach "any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds," 34 C.F.R. § 668.14(b)(22)(iii)(C)(*2*) (2011).

### 3. The Misrepresentation Regulations

The current Misrepresentation Regulations differ in several respects from the 2002 regulations. First, the 2002 regulations defined "*misrepresentation*" to mean "[a]ny false, erroneous or misleading statement an eligible institution makes to a student enrolled at the institution, to any prospective student, to the family of an enrolled or prospective student, or to the Secretary." 34 C.F.R. § 668.71(b) (2010). The 2002 regulations further defined "*substantial misrepresentation*" as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

Under the new regulations, "misrepresentation" is defined as:

> [a]ny false, erroneous or misleading statement an eligible institution, . . . *organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services* makes *directly or indirectly* to a student, prospective student *or any member of the public, or*

*to an accrediting agency, to a State agency*, or to the Secretary. *A misleading statement includes any statement that has the likelihood or tendency to deceive or confuse. A statement is any communication made in writing, visually, orally, or through other means.*

34 C.F.R. § 668.71(c) (2011) (emphases added). The Misrepresentation Regulations do not, however, establish a new definition of "*substantial misrepresentation*." *Id.*

Second, the 2002 regulations set forth that the Secretary could initiate a proceeding against a participating institution for making any substantial misrepresentation "regarding the nature of its educational program, its financial charges or the employability of its graduates." 34 C.F.R. § 668.71(a) (2010). The 2002 regulations then clarified what kinds of statements would fall within those three subject areas. *See id.* §§ 668.72–.74. In contrast, the current Misrepresentation Regulations describe that the agency may initiate a proceeding against an institution for engaging in misrepresentation "regarding *the eligible institution, including about* the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b) (2011) (emphasis added). The regulations then clarify what statements fall within those subject areas and identify an additional covered subject area – an institution's relationship with the Department. *See id.* §§ 668.72–.75.

Third, the 2002 regulations and the current Misrepresentation Regulations differ in their respective descriptions of the steps that the Secretary must or may follow after receiving notice of an alleged misrepresentation. The 2002 regulations established that "[i]f the misrepresentation is minor and can be readily corrected, the designated department official informs the institution and endeavors to obtain an informal, voluntary correction." 34 C.F.R. § 668.75(b) (2010). The regulations provided in the alternative that "[i]f the designated

department official finds that the complaint or allegation is a substantial misrepresentation," then he or she initiates a formal action against the institution, *id.* § 668.75(c)(1), pursuant to the procedural requirements set forth in subpart G of the Department's regulations, *see id.* §§ 668.81–.98.

In promulgating the current Misrepresentation Regulations, the Department restyled the agency's menu of enforcement options. The relevant provision reads:

> If the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may –
>
> > (1) Revoke the eligible institution's program participation agreement;
> >
> > (2) Impose limitations on the institution's participation in the title IV, HEA programs;
> >
> > (3) Deny participation applications made on behalf of the institution; or
> >
> > (4) Initiate a proceeding against the eligible institution under subpart G of this part.

34 C.F.R. § 668.71(a) (2011). There is no provision in the regulations specifically addressing how the Secretary should proceed in the event of a minor misrepresentation. *See id.* § 668.71.

Like the 2002 regulations, the Department's final regulations lay out in subpart G the procedures that the Secretary must follow to initiate a formal proceeding against an institution for violating any of the HEA's requirements. *See id.* §§ 668.81–.98.

## D. Procedural History

Appellant is "an association of for-profit schools in the

private sector education industry, representing more than 1,500 such schools. Every year, [its] members educate more than one and a half million students." *Career Coll. Ass'n*, 796 F. Supp. 2d at 114. Shortly after the Department issued its final regulations, Appellant filed this suit in the District Court, challenging the regulations under both the Constitution and the APA. Appellant claimed that the Compensation Regulations include provisions that exceed the authority of the Secretary under the HEA and are otherwise arbitrary and capricious. Appellant claimed that the Misrepresentation Regulations: (1) exceed the HEA's scope in several respects; (2) are otherwise arbitrary and capricious; and (3) violate the First Amendment by imposing content-based and speaker-based prohibitions on both core noncommercial and protected commercial speech. Appellant additionally claimed that the school authorization regulation exceeds the Department's statutory authority, because it impermissibly alters the allocation of power between the federal government and the states in a traditional area of state concern. Appellant also claimed that the school authorization regulation is otherwise arbitrary and capricious. Finally, Appellant claimed that the distance education regulation is arbitrary and capricious. Both parties moved for summary judgment.

During the proceedings in the District Court, the Department issued a Dear Colleague Letter to address questions that regulated parties had raised regarding the challenged regulations. *See* Letter from Eduardo M. Ochoa, Dep't of Educ., to Colleague (Mar. 17, 2011) ("Dear Colleague Letter"), J.A. 130; *see also* NPRM, 75 Fed. Reg. at 34,820 (reserving the right to respond to ongoing questions by publishing "a Dear Colleague Letter"). The letter purported to "provide[] additional guidance" without "mak[ing] any changes to the regulations." Dear Colleague Letter at 1, J.A. 130. The letter specifically addressed the arguments that Appellant had raised in its complaint.

The District Court granted the Department's motion for summary judgment in almost all respects. The court upheld the Compensation and Misrepresentation regulations entirely, and it held that Appellant lacked standing to challenge the school authorization regulation. However, the court granted Appellant's motion for summary judgment with respect to the distance education regulation. It found that the regulation violated the APA, because the Department had failed to provide adequate notice that it was contemplating the new rule. Both parties appealed.

## II. Analysis

### A. Standard of Review

We review the District Court's grant of summary judgment *de novo*. *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010). Furthermore, "[i]n a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (citations omitted).

Appellant's claims that various provisions of the challenged regulations are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), are reviewed under the well-known *Chevron* framework. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

> Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to

the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44.

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 141 (2007) (alterations in original).

The fact that some of the challenged regulations are inconsistent with the Department's past practice "is not a basis for declining to analyze the agency's interpretation[s] under the *Chevron* framework." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). As the Supreme Court has stated, "if the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id.* (citations omitted). An agency's departure from past practice can, however, if unexplained, render regulations arbitrary and capricious. *See id.*; *Rust v. Sullivan*, 500 U.S. 173, 186–87 (1991).

Appellant's claims that the challenged regulations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), require us to determine whether the regulations are the product of reasoned decisionmaking. As the Supreme Court has explained:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In evaluating an agency's decisionmaking, our review is "fundamentally deferential." EDWARDS & ELLIOTT 172. But we are limited to assessing the record that was actually before the agency. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

A regulation will be deemed arbitrary and capricious, if the issuing agency failed to address significant comments raised during the rulemaking. *See PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). An agency's obligation to respond, however, is not "particularly demanding." *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993). A regulation also violates the APA, if it is not a "logical outgrowth" of the agency's proposed regulations. *See e.g.*, *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94–95 (D.C. Cir. 2010). This rule ensures that regulated parties have an opportunity to comment on new regulations. *See id.*

Two additional points merit mention before turning to Appellant's claims. First, Appellant is pursuing a facial challenge to the regulations. "To prevail in such a facial challenge, [Appellant] 'must establish that no set of circumstances exists under which the [regulations] would be valid.' That is true as to both the constitutional challenges and the statutory challenge[s]." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citations omitted); *see also Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011). "[I]t is not enough for [Appellant] to show the [challenged regulations] could be applied unlawfully." *Sherley*, 644 F.3d at 397 (citations omitted); *see also Rust*, 500 U.S. at 183. As we explain below, this limited exception to the rule for an overbreadth challenge to a regulation of speech has no application in this case. Where we conclude that a challenged regulatory provision does not exceed the HEA's limits and otherwise satisfies the requirements of the APA, we

will uphold the provision and preserve the right of complainants to bring as-applied challenges against any alleged unlawful applications.

Second, the Department offered interpretations of the challenged regulations in its Dear Colleague Letter and also in its briefs to the District Court and this court. An agency's permissible interpretation of its own regulation normally "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted) (internal quotation marks omitted), even when the interpretation is first articulated in the course of litigation, *see Auer v. Robbins*, 519 U.S. 452 (1997). The Supreme Court has specified additional constraints on the deference owed to an agency's interpretation of its own regulation in *Thomas Jefferson*, *Auer*, and other decisions. *See, e.g.*, *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011); *Christensen v. Harris Cnty.*, 529 U.S. 576 (2000). Pursuant to this line of authority, Appellant argues that the Department's interpretations are not entitled to any deference. As we make clear, however, it is unnecessary to resolve this contention.

## B. The Compensation Regulations

### 1. The Regulations Do Not Exceed the HEA's Limits

Appellant offers two arguments in support of its claim that the Compensation Regulations exceed the HEA's prohibition on incentive based compensation. Neither is persuasive.

- *Salary Adjustments*

The HEA prohibits institutions from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. § 1094(a)(20). In the Compensation Regulations, the Department interpreted the phrase

"commission, bonus, or other incentive payment" to mean "a sum of money or something of value, other than a fixed salary or wages." 34 C.F.R. § 668.14(b)(22)(iii)(A) (2011). The Compensation Regulations thus allow a school to provide a salary adjustment to a recruiter, only if the adjustment is not "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." *Id.* § 668.14(b)(22)(ii)(A). At *Chevron* step one, Appellant must demonstrate that the HEA "*unambiguously* forecloses" that interpretation. *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011) (citation omitted). Appellant has not satisfied that "heavy burden." *Id.*

Starting with the HEA's text, we have no trouble concluding that the phrase "any commission, bonus, or other incentive payment" is broad enough to encompass salary adjustments. We need look no further than to the phrase "other incentive payment." Since that term is not defined, we must give it its ordinary meaning. *See FCC v. AT & T Inc.*, 131 S. Ct. 1177, 1182 (2011) (citation omitted). When used as an adjective, incentive means "[i]nciting" or "motivating," AMERICAN HERITAGE DICTIONARY 650 (2d Coll. ed. 1982), and a payment is "[t]hat which is paid," WEBSTER'S INTERNATIONAL DICTIONARY 1797 (2d ed. 1957). A salary adjustment fits within the plain meaning of the statutory term, because it is something paid by a school to recruiters to motivate improved performance.

Appellant's theory that a standard salary adjustment is not a prohibited form of compensation is perplexing. After all, Appellant defends the 2002 regulations, *see* Appellant's Br. at 3–4, 14, which established that at least some salary adjustments – *i.e.*, those made more than twice a year as well as those based solely on recruitment numbers, *see* 34 C.F.R. § 668.14(b)(22)(ii)(A) (2010) – are prohibited commissions, bonuses, or other incentive payments. Appellant has not meaningfully explained how the HEA could authorize the

agency to prohibit some salary adjustments but not others. But quite apart from this incongruity, we find Appellant's arguments to be unpersuasive.

Appellant argues that the Department's interpretation is foreclosed by basic rules of statutory interpretation. Invoking the related canons *expressio unius est exclusio alterius* and *ejusdem generis*, Appellant claims that the phrase "other incentive payment" cannot be a "catch-all that dramatically changes the scope of the statute." Appellant's Br. at 17; *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1404 (2008) ("[W]hen a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."). And invoking the canon against surplusage, Appellant argues that to construe "other incentive payment" broadly would impermissibly render the prohibition on bonuses and commissions superfluous. Appellant thus urges that we limit "other incentive payment" to mean payments such as "rewards or prizes." Appellant's Br. at 17.

This court's decisions discussing the application of these canons at *Chevron* step one are not entirely consistent. *Compare Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644–45 (D.C. Cir. 2000) (rejecting agency's interpretation at step one based on the tandem canons "of avoiding surplusage and *expressio unius*"), *with Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1405 (D.C. Cir. 1996) ("*Expressio unius* 'is simply too thin a reed to support the conclusion that Congress has clearly resolved [an] issue.'" (alteration in original) (citations omitted)), *and Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("[A] congressional prohibition of particular conduct may actually *support* the view that the administrative entity can exercise its authority to eliminate a similar danger." (citation omitted)). But it is clear that a court need not follow these canons, when they

do "not hold up in the statutory context." *Hawke*, 211 F.3d at 644 (citations omitted). Here, Congress phrased the relevant provision broadly – employing words and phrases like "any" and "directly *or* indirectly." 20 U.S.C. § 1094(a)(20); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) (noting that "'any' has an expansive meaning"); *Roma v. United States*, 344 F.3d 352, 360 (3d Cir. 2003) (describing "'*directly or indirectly*'" as "extremely broad language"). Thus, Congress intended the phrase "other incentive payment" to broadly cover abuses that Congress had not enumerated. Appellant's objection that "[s]alary adjustments are not an obscure form of payment beyond Congress's foresight,"Appellant's Reply Br. at 10, misses the point. While Congress was undoubtedly aware that many schools provide salary-based compensation to recruiters, it may not have anticipated that schools would circumvent the HEA's prohibition on incentive based compensation through the strategic use of salary adjustments.

Nor do we find any other indication that Congress unambiguously intended to exclude salary adjustments from the prohibition on incentive based compensation. *See, e.g.*, *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (describing that courts must "exhaust the traditional tools of statutory construction" at *Chevron* step one (citations omitted) (internal quotation marks omitted)). Appellant directs us to the Conference Report for the 1992 amendments to the HEA. But that report demonstrates merely that Congress was concerned with schools' "use of commissioned sales representatives." H.R. REP. NO. 102-630, at 499 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. at 614. It certainly does not show or even suggest that Congress was affirmatively unconcerned with the use of "salaried recruiters." Appellant's Br. at 19.

Finally, the fact that courts have interpreted the HEA not to prohibit certain compensation practices does not compel a different outcome here. In *Corinthian Colleges*, the Ninth

Circuit stated that "the HEA does not prohibit *any and all* employment-related decisions on the basis of recruitment numbers; it prohibits only a particular type of incentive compensation." 655 F.3d at 992. But the court held only that "adverse employment actions, including termination, on the basis of recruitment numbers remain permissible" under the HEA. *Id.* at 992–93 (citations omitted). It did not address salary adjustments at all. More importantly, neither that decision nor the Ninth Circuit's unpublished decision in *United States ex rel. Bott v. Silicon Valley Colleges*, No. 06-15423, 2008 WL 59364 (9th Cir. Jan. 4, 2008) is binding law in this circuit. And neither decision stated that its holding was unambiguously compelled by the HEA; hence, neither can trump the Department's interpretation. *See Brand X Internet Servs.*, 545 U.S. at 982.

We therefore proceed to *Chevron* step two. Appellant initially argues that the Department forfeited its right to invoke step-two deference. In the final rule, the Department responded to comments that its test for identifying prohibited compensation was unclear, stating that it "believe[d] that the prohibition identified in section 487(a)(20) of the HEA is clear and that institutions should not have difficulty maintaining compliance with the new regulatory language." Final Regulations, 75 Fed. Reg. at 66,876–77. An agency cannot claim deference, when it adopts a regulation based on its judgment that a particular "interpretation is compelled by Congress." *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted). However, it would be a stretch, to say the least, to hold that the Department's use of the word "clear" demonstrates that the agency meant to suggest that its regulatory interpretation was "compelled by Congress." *Id.* In *Peter Pan*, the agency had declared that a private party's interpretation of a statutory term was "*not consistent with the plain language of the statute and the legislative history*," and the agency had

further stated what the statutory phrase "*clearly meant*." *Id*. at 1353 (citation omitted) (internal quotation marks omitted). But the regulations at issue here reflect more than mere "parsing of the statutory language." *Id.* at 1354 (citation omitted) (internal quotation marks omitted). The agency adopted the regulations based on its "experience and expertise," *id.* (citation omitted) (internal quotation marks omitted), after administering the safe harbors for almost a decade, *see* Final Regulations, 75 Fed. Reg. at 66,872–73, 66,877.

At step two, we easily conclude that the Compensation Regulations are entitled to deference, because they are not manifestly contrary to the HEA. The agency promulgated the regulations based on known abuses. As the Department explained, "unscrupulous" institutions used the safe harbor for salary adjustments to "circumvent the intent" of the HEA and to avoid detection and sanction for engaging in unlawful compensation practices. *See* Final Regulations, 75 Fed. Reg. at 66,872–73, 66,877. The safe harbor enabled a school to tell the Department that it was basing compensation on both recruitment numbers and other qualitative factors, when in fact, "these other qualitative factors [were] not really considered when compensation decisions [were] made." *Id.* at 66,873. As we have already discussed, the agency's assessment of the safe harbor finds support in the record – specifically, in the Department's investigation into the practices of one school, several *qui tam* actions against other schools, and media reports, as well as from comments the agency received during the rulemaking. *See, e.g.*, Comments from Nat'l Ass'n for Coll. Admission Counseling to U.S. Dep't of Educ. 1–6 (June 22, 2009) ("NACAC Comment"), J.A. 323–28.

Appellant's reliance on GAO Report Number 10-370R to refute the Department's assessment of the safe harbor is misplaced. Appellant summarizes that report as finding that "substantiated violations of the HEA's compensation restriction

have not significantly increased in frequency or severity since the adoption of the 2002 regulations." Appellant's Br. at 31. But that report expressly "d[id] not . . . assess the overall impact of the safe harbor regulations on Education's efforts to enforce the incentive compensation ban." U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-10-370R, HIGHER EDUCATION 2 (2010), J.A. 268. Indeed, the Department justified the regulations partially on its conclusion that the safe harbors had made it more difficult to substantiate violations of the HEA in the first place. Moreover, the Compensation Regulations address this problem. They allow the Department to use *any* evidence that an institution based compensation on recruitment numbers to substantiate a violation; thus, the Department no longer needs to see through an institution's "smoke and mirrors." Phoenix Report at 10, J.A. 156; *see also id.* at 17–18, 25–26 (documenting the school's deceptive compensation practices), J.A. 163–64, 171–72.

Appellant also argues that the Department's interpretation is arbitrary and capricious, because it deprives institutions of the ability to provide *any* merit-based salary adjustments to recruiters. After all, Appellant insists, a recruiter's job is to recruit. But the Department adequately addressed this claim. A recruiter's job goes beyond maximizing recruitment numbers; a recruiter also offers students "a form of counseling" about whether they are a good fit for a particular institution. Final Regulations, 75 Fed. Reg. at 66,872. Therefore, a school may still provide merit-based salary adjustments based on a recruiter's ability effectively to match students with that school. Moreover, the Department has identified a number of other factors on which permissible salary adjustments may be based – *e.g.*, professionalism, expertise, student evaluations, and seniority. *See id.* at 66,877.

Indeed, even under the 2002 regulations, schools were not allowed to offer salary adjustments "based solely" on recruitment numbers. 34 C.F.R. § 668.14(b)(22)(ii)(A) (2010).

Schools have thus been required to take into account job-performance factors unrelated to recruitment numbers for nearly a decade. We think it implausible that schools are now at a loss for such factors. Appellant objects that its members cannot rely on the factors that they identified under the 2002 regulations, because the Department has sought to punish schools for using those factors. *See* Appellant's Br. at 23 n. 3; Appellant's Reply Br. at 22 n.10. This argument is farcical. The Department means to sanction institutions for using these factors *to hide their true compensation practices*. The Department has never adopted Appellant's straw-person position that factors such as professionalism or experience are inherently related to recruitment numbers. And because of the facial nature of Appellant's challenge, we need not address the concern that the Department could adopt that position under the regulations in the future. In the event that the Department does so, a school may seek relief through an as-applied challenge.

• *Managers and Supervisors*

The Compensation Regulations apply the HEA's incentive based compensation prohibition to higher level employees. To achieve this effect, the Department interpreted the phrase "any persons . . . engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance," 20 U.S.C. § 1094(a)(20), to include "higher level employee[s] with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds," 34 C.F.R. § 668.14(b)(22)(iii)(C)(*2*) (2011). This interpretation easily passes muster under *Chevron*.

At step one, the statutory phrase is broad, using the word "any" to modify "persons," "recruiting," and "admission activities." Appellant argues that the phrase "engaged in" must be construed narrowly. But the term is undefined, and Appellant offers no authority suggesting that the term has a limited, specific meaning. The Department, by contrast, argues

persuasively that "engaged in" should be read broadly based on both the plain meaning of "engage" – "[t]o involve onself," AMERICAN HERITAGE DICTIONARY 454 – and case law, *see Ramos v. Universal Dredging Corp.*, 653 F.2d 1353, 1358 (9th Cir. 1981) (noting that a statute should be "liberally construed" because of its use of the "*broad*" phrase "'*engaged in maritime employment*'"). The phrase "admission activities" is also broad and can connote supervision as well as participation. *See* AMERICAN HERITAGE DICTIONARY 77 (defining "activity" to include "[a] specified form of supervised action or field of action"). Therefore, there was a statutory basis for the Department to conclude that persons "with responsibility for" recruitment or admission activities can be "engaged in" recruitment or admission activities.

At step two, the Department's interpretation that the HEA's prohibition on incentive based compensation can apply to higher level employees is permissible, because it is not manifestly contrary to the statute. Here too, the Department was responding to known abuses. As the Department explained in its proposed rulemaking, "senior management may drive the organizational and operational culture at an institution, creating pressures for top, and even middle, management to secure increasing numbers of enrollments from their recruiters." NPRM, 75 Fed. Reg. at 34,818. This conclusion finds support in the administrative record – particularly, the Department's investigation into the practices of the managers overseeing recruitment at the University of Phoenix. *See* Phoenix Report at 10–12, 17–20, J.A. 156–58, 163–66.

Appellant's argument that the Department's application of the HEA to higher level employees is counter to the Act's legislative history – whether intended as a *Chevron* step-one or step-two argument – is unpersuasive. The House Report on which Appellant relies demonstrates merely that Congress was concerned with "salespeople," H.R. REP. NO. 102-630, at 499

(1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. at 614, not that Congress manifestly did not intend to regulate managers and supervisors. Appellant's claim that the Department forfeited its right to invoke *Chevron* is also unavailing for the reasons discussed above.

Finally, the Department has committed to evaluating whether a specific employee or manager is subject to the incentive based compensation prohibition on a case-by-case basis. *See* Final Regulations, 75 Fed. Reg. at 66,874. If the agency overreaches by pursuing actions against institutions that provide incentive based compensation to employees or managers who are not responsible for driving organizational culture toward a focus exclusively on recruitment numbers, those institutions may seek appropriate as-applied relief.

2. Two Aspects of the Regulations Are Arbitrary and Capricious for Want of Reasoned Decisionmaking

Appellant argues that the Compensation Regulations fail for want of reasoned decisionmaking. For the most part, we find Appellant's arguments to be specious and unworthy of serious discussion. The Compensation Regulations "have sufficient content and definitiveness as to be a meaningful exercise in agency lawmaking," *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997), with or without reference to the Department's Dear Colleague Letter. The Department provided an adequate and more-than-conclusory explanation for why it adopted the regulations, primarily based on its experience administering the 2002 safe harbors. The Department's budgetary analysis does not call into question the benefits of the regulations – it reflects that the benefits were difficult to quantify. And the Department was entitled to replace bright-line rules with contextual rules.

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011), on which Appellant places much emphasis, is easily

distinguishable, even apart from our conclusion that the Department has satisfactorily justified its adoption of the Compensation Regulations. In *Business Roundtable*, we found a regulation to be arbitrary and capricious, because, in promulgating it, the SEC had failed to satisfy its "unique [statutory] obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation.'" *Id.* at 1148 (citation omitted). Appellant points to no such "unique" statutory obligation here. Moreover, in *Business Roundtable*, this court criticized the SEC for failing to consider empirical studies and quantitative data. *See id.* at 1150–51. The Appellant points to no data or study the Department ignored and thus *Business Roundtable* is of no help to its argument.

There are two aspects of the regulations, however, that are lacking for want of adequate explanations. First, the elimination of the safe harbor for compensation "based upon students successfully completing their educational programs, or one academic year of their educational programs," 34 C.F.R. § 668.14(b)(22)(ii)(E) (2010), is arbitrary and capricious without some better explanation from the Department. Congress created the Title IV programs to enable more students to attend and graduate from postsecondary institutions. This specific safe harbor seems perfectly in keeping with that goal. Indeed, the elimination of this safe harbor could even discourage recruiters from focusing on the most qualified students.

The Department offered a brief explanation for its elimination of this safe harbor. But its fleeting reference to "short-term, accelerated programs" and its isolated examples of students who graduated from schools but could not find commensurate work, *see* Final Regulations, 75 Fed. Reg. at 66,874, are insufficient. Furthermore, the Department points to nothing in the record supporting these assertions. It may well be that the Department actually eliminated this safe harbor based on the agency's belief that institutions have used graduation

rates as a proxy for recruitment numbers. But the Department never offered that explanation. We thus remand to the District Court with instructions to remand to the Department to allow it to explain its decision to eliminate this specific safe harbor. *Cf. La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003) (remanding, rather than vacating, based on the conclusion that it was "not unlikely" that the agency "'[would] be able to justify a future decision to retain the [r]ule'" (citation omitted)).

Second, the Department failed to address the concern, identified by at least two commenters, that the Compensation Regulations could have an adverse effect on minority enrollment. During the comment period, the Career Education Corporation posed the following question to the Department:

> How will the new regulations apply to employees who are not involved in general student recruiting, but who are involved in recruiting certain types of students? Examples would include college coaches who recruit student athletes, and employees in college diversity offices who recruit minority students.

Letter from Career Educ. Corp. to Jessica Finkel, U.S. Dep't of Educ. 40 (Aug. 1, 2010), J.A. 357. DeVry, Inc. asked similar questions:

> Can schools increase compensation to personnel involved in diversity outreach programs for successfully assembling a diverse student body? Does the Department intend to foreclose schools' ability to compensate their staffs for successfully managing outreach programs for students from disadvantaged backgrounds . . . ?

Letter from DeVry, Inc. to Jessica Finkel (Aug. 1, 2010), J.A. 359.

As noted, an agency's obligation to address specific

comments is not demanding. Here, the Department fell just short. In the rulemaking, the Department appears to have grouped together related comments. In one such bundle, the Department summarized that "[s]ome commenters . . . asked whether the proposed regulations would permit a president to receive a bonus or other payment if one factor in attaining the bonus or other payment was meeting an institutional management plan or goal that included increasing minority enrollment." Final Regulations, 75 Fed. Reg. at 66,874.

In the discussion that followed, the Department stated that the Compensation Regulations "apply to all employees at an institution who are engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds." *Id.* However, the Department never really answered the questions posed by Career Education Corporation and DeVry, Inc., because it failed to address the commenters' concerns. It may be that the Department misinterpreted the concerns raised by the comments to be limited to minority recruitment by higher-level employees. *See id.* Nevertheless, the agency's "failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense." *Int'l Union, United Mine Workers*, 626 F.3d at 94 (citation omitted). We therefore remand to the District Court with instructions to remand to the Department to allow it to address these concerns. It will be a simple matter for the Department to address these matters on remand.

In short, because the Department has not adequately explained its reasoning with respect to two aspects of the Compensation Regulations, we reverse, in part, the judgment of the District Court. The case is remanded with instructions to remand to the Department for further consideration. On remand, the Department must better explain its decision to eliminate the safe harbor based on graduation rates, and it must offer a

reasoned response to the comments suggesting that the new regulations might adversely affect diversity outreach.

## C. The Misrepresentation Regulations

### 1. The Regulations Exceed the HEA's Limits in Three Respects

Appellant claims that the Misrepresentation Regulations exceed the HEA's limitations in several respects: by allowing the Secretary to sanction an institution without providing it with statutorily required procedural protections; by allowing the Secretary to sanction an institution for making misrepresentations regarding subjects that are not covered by the HEA; and by allowing the Secretary to take action against an institution for making statements that are not substantial misrepresentations.

• *Procedural Protections*

The HEA provides that the Secretary may – following reasonable notice and opportunity for a hearing – limit, suspend, or terminate a school's eligibility to participate in Title IV programs for making certain misrepresentations. *See* 20 U.S.C. § 1094(c)(3)(A). Section 668.71(a) of the Misrepresentation Regulations states that, upon determining that an institution has engaged in substantial misrepresentation, the agency may: "(1) Revoke the eligible institution's program participation agreement; (2) Impose limitations on the institution's participation in the title IV, HEA programs; (3) Deny participation applications made on behalf of the institution; or (4) Initiate a proceeding against the eligible institution under subpart G of this part." 34 C.F.R. § 668.71(a) (2011). Subpart G of the Department's regulations sets forth the procedures that the agency must follow to initiate a formal proceeding against a school. *See id.* §§ 668.81–.98.

According to Appellant, because section 668.71(a) lists the

agency's options using "or," and because only the fourth option requires the agency to follow subpart G's procedures, the effect of the provision is to allow the agency to take the first three actions without following those procedures. Appellant does not challenge section 668.71(a)(3), which deals only with applicants, as opposed to participating schools. But Appellant argues that sections 668.71(a)(1) and (a)(2) exceed the HEA's limits by allowing the agency – without affording any procedural protections – to revoke certified schools' program participation agreements and to impose limitations on certified schools' participation. We agree.

The Department does not contest that if sections 668.71(a)(1) and (a)(2) have the described effect, they are impermissible. Instead, it attempts to salvage section 668.71(a) as a whole by interpreting sections 668.71(a)(1) and (a)(2) not to affect the procedural rights of certified schools. We acknowledge that the Department has consistently maintained the same position with respect to these sections throughout the rulemaking. *See, e.g.*, Dear Colleague Letter at 14, J.A. 143 ("There is nothing in revised section 668.71(a) that reduces the procedural protection given by the HEA and applicable regulations to an institution to contest the specific action the Department may take to address substantial misrepresentation by the institution."); Final Regulations, 75 Fed. Reg. at 66,915 ("[N]othing in the proposed regulations diminishes the procedural rights that an institution otherwise possesses to respond to [an adverse] action."). The Department's explanations are unconvincing. They merely purport to explain why the disputed regulatory provisions were never erroneous in the first place by reinterpreting the regulation in a way the text does not support.

With respect to section 668.71(a)(1), the Department contends that the word "revoke" is a term of art that refers specifically and only to the act of ending an agreement with a

*provisionally* certified institution. *See* 20 U.S.C. § 1099c(h) (allowing for provisional certification of schools). The Department apparently uses the word "terminate" to describe the process of ending an agreement with a fully certified school. *See* 34 C.F.R. § 668.86(a) (2011). Under this interpretation, section 668.71(a)(1) would be valid, because the Department may "revoke" provisional certification without following the procedures required to "terminate" an agreement with a fully certified school. *See* 34 C.F.R. § 668.13(d) (2011); *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1274–75 (D.C. Cir. 1996). But section 668.71(a)(1) simply cannot bear the Department's interpretation. The section authorizes the agency to revoke the agreement of an "eligible institution," not of any provisionally certified institution. We thus cannot defer to the Department's interpretation, because it is inconsistent with the terms of the regulation. *See Thomas Jefferson Univ.*, 504 U.S. at 512.

The Department's interpretation of section 668.71(a)(2) fares no better. The agency interprets that section to require the Secretary to follow the procedures for imposing limitations on the eligibility of institutions that are found in subpart G of the Department's regulations. *See* Gov't's Br. at 46–47 (citing 34 C.F.R. §§ 668.86(a)(1)(ii), (b)(1), (4)). But section 668.71(a)(4) independently authorizes the Secretary to initiate proceedings under subpart G. In other words, under the Department's interpretation, section 668.71(a)(2) is wholly included within section 668.71(a)(4). The interpretation is thus plainly inconsistent with section 668.71(a) as a whole, which lists the Secretary's options using the disjunctive. Under principles of statutory construction, "terms connected by a disjunctive [should] be given separate meanings, unless the context dictates otherwise; here it does not." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (citation omitted); *see also In re ESPY*, 80 F.3d 501, 505 (D.C. Cir. 1996) (per curiam) ("[A] statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives.'" (citation omitted)).

In sum, section 668.71(a) exceeds the Act's limits by allowing the Secretary – without affording procedural protections – to revoke a program participation agreement with a fully certified school and to impose limitations on the eligibility of a fully certified school. The judgment of the District Court is reversed on this point, and we remand to the trial court with instructions to remand to the Department, so that it can revise this provision.

- *Misrepresentations Regarding Nonproscribed Subjects*

The HEA authorizes the agency to sanction an institution for engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. § 1094(c)(3)(A). In notable contrast, the Misrepresentation Regulations provide that the agency may sanction an institution for engaging in "substantial misrepresentation *regarding the eligible institution, including* about the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b) (2011) (emphasis added). The regulations then clarify *four* categories of proscribed misrepresentations – *i.e.*, about the nature of an eligible institution's educational program, *id.* § 668.72, about the nature of an institution's financial charges, *id.* § 668.73, about the employability of an institution's graduates, *id.* § 668.74, and *about an institution's relationship with the Department*, *id.* § 668.75.

Appellant claims that the regulations allow the agency to sanction schools for making misrepresentations regarding subjects that are not covered by the HEA. We agree. Section 668.71(b) prohibits institutions from engaging in "misrepresentation regarding the eligible institution." That phrase obviously covers the three subjects listed in the HEA, but it also plainly encompasses more. Because it is followed by the word "including," the phrase encompasses both the enumerated

subjects listed in 20 U.S.C. § 1094(c)(3)(A) and anything falling within the ordinary meaning of "misrepresentation regarding the eligible institution." *See Schumann v. Comm'r*, 857 F.2d 808, 811 (D.C. Cir. 1988). And an institution can clearly make misrepresentations "regarding the institution" that do not fall within the HEA's three listed subject areas. We find immediate support for that proposition in section 668.75, which prohibits an institution from misrepresenting its relationship with the Department, *see* 34 C.F.R § 668.75 (2011) – a subject that is not proscribed by the HEA.

Here too, the Department essentially concedes the point. It explained in the Dear Colleague Letter, and it argues here, that the Misrepresentation Regulations should not be read to authorize the agency to sanction misrepresentations regarding nonproscribed topics. We cannot defer to this belated interpretation, however, because it is plainly inconsistent with the terms of the regulation. *Thomas Jefferson Univ.*, 512 U.S. at 512; *see also Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1048 (D.C. Cir. 2001) (per curiam) ("[W]e should not defer to an agency's interpretation imputing a limiting provision to a rule that is silent on the subject, lest we 'permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.'" (citation omitted)). We therefore reverse on this point and remand to the District Court with instructions to remand to the Department, so that it can revise sections 668.71(b) and 668.75 to match its description of how the regulations should function.

- *"Substantial Misrepresentation"*

The HEA prohibits institutions from engaging in "substantial misrepresentation," a phrase which is not defined in the statute. In the Misrepresentation Regulations, the Department adopted a new regulatory definition of misrepresentation but kept the existing definition of substantial misrepresentation. Appellant argues that the regulations as

modified exceed the HEA's limits in several respects; we find only one claim persuasive.

The agency has long defined "*misrepresentation*" as used in the HEA to mean "[a]ny false, erroneous or misleading statement." *E.g.*, 34 C.F.R. § 668.71(b) (2010). The new Misrepresentation Regulations start with that same definition, but further define "[a] misleading statement" to "include[] any statement that has the likelihood or tendency to deceive or confuse." 34 C.F.R. § 668.71(c) (2011). Appellant's primary argument is that the provision exceeds the HEA's limits, insofar as it reaches statements that merely have the likelihood or tendency to confuse. We review this claim under *Chevron*, and we reject the Department's interpretation at step one.

"Misrepresentation" means "[t]he act of making a false or misleading statement about something, usu. with the intent to deceive." BLACK'S LAW DICTIONARY 1016 (7th ed. 1999). Appellant argues that the statute unambiguously proscribes only statements that are "false" or "misleading" – *i.e.*, "[t]ending to [lead in the wrong direction]" or "deceptive." AMERICAN HERITAGE DICTIONARY 803. A statement that is merely confusing falls outside of that scope. The Department counters that a "misrepresentation" can be a statement that is true, *see* BLACK'S LAW DICTIONARY 1016 ("[A]n assertion need not be fraudulent to be a misrepresentation." (alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. a. (1981)), as well as a statement that is not made with the intent to deceive, s*ee id.* ("Thus a statement intended to be truthful may be a misrepresentation because of ignorance or carelessness, as when the word 'not' is inadvertently omitted or when inaccurate language is used." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. a. (1981)).

If there is any merit to the Department's claim that a *misrepresentation* may include a statement that is both truthful and nondeceitful, this view can hold no water in the context of

the HEA, which prohibits institutions from engaging in *substantial* misrepresentation. *See* AMERICAN HERITAGE DICTIONARY 1213 (defining "substantial" as "[c]onsiderable in importance, value, degree, amount, or extent"). Furthermore, to allow the Department to proscribe statements that are merely confusing would raise serious First Amendment concerns – even with respect to commercial speech. We therefore hold that, under the HEA, "substantial misrepresentation" unambiguously means something more than a statement that is merely confusing. We accordingly vacate section 668.71(c), insofar as it defines misrepresentation to include true and nondeceitful statements that have only the tendency or likelihood to confuse.

We do not take Appellant to be challenging the Department's interpretation that the HEA reaches "misleading statement[s]," insofar as that term encompasses "any statement," truthful or otherwise, "that has the likelihood or tendency to deceive." 34 C.F.R. § 668.71(c) (2011); *see also* Appellant's Br. at 42–44. Nor do we see how Appellant could challenge that aspect of the Misrepresentation Regulations. At *Chevron* step one, as we have already noted, a misrepresentation can be a true statement that is deceitful. And at step two, the Department justified the regulations based on known abuses, *see* Final Regulations, 75 Fed. Reg. at 66,914, that are borne out by the record, *see, e.g.*, U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-10-948T, FOR-PROFIT COLLEGES (2010), J.A. 439; NACAC Comment 9–16 (summarizing investigations, allegations, and reports of, *inter alia*, schools' deceitful marketing practices), J.A. 331–38. Moreover, the fact that *one* of the studies the Department cited in the rulemaking was subject to methodological criticisms and revision *after* the Department promulgated the regulations, *see* Bobb Barr, *GAO 'Exposé' of For-Profit Colleges*, POLITICO (Feb. 2, 2011), http://www.politico.com/news/stories/0211/48601.html, does not call into question the Department's reasoning.

Appellant separately argues that the Misrepresentation Regulations exceed the HEA's limitations by defining "substantial misrepresentation" without an intent requirement. *See* Appellant's Br. at 46–47; Appellant's Reply Br. at 37–38. The scope of Appellant's argument is unclear. On the one hand, Appellant could be challenging only the Department's regulatory definition that "misleading statement[s]" include nondeceitful, confusing statements. If that is the extent of Appellant's position, then we have already addressed it.

On the other hand, Appellant could be objecting to the Department's longstanding interpretation that the HEA prohibits "false" and "erroneous" statements, regardless of the speaker's intent. If Appellant sought to advance that broader argument, it needed to do so more much clearly. But the position is untenable in any event. At *Chevron* step one, we have already explained that "misrepresentation" does not unambiguously exclude inadvertent and negligent, factually untrue statements. Nor does the legislative history to which Appellant directs us demonstrate that Congress unambiguously intended to prohibit only intentionally false statements. *See* H.R. REP. NO. 94-1086, at 13 (1976). And at step two, we think that allowing the Secretary to sanction schools for making substantial, negligent or inadvertent, false statements is consistent with the HEA's goals.

Finally, Appellant argues that the Department has read "substantial" out of the statute. Here too, the breadth of Appellant's position is unclear. In its narrowest form, Appellant's argument is that the Department impermissibly "eliminat[ed] a regulation that expressly stated that the Department would address 'minor' misrepresentations that could be 'readily corrected' on 'an informal' and 'voluntary' basis." Appellant's Br. at 44 (quoting 34 C.F.R. § 668.75(b) (2010)). We find no merit in this argument. The fact that "substantial" appears in the HEA does not mean that the Department must

have a specific regulation stating how it will respond to minor misrepresentations; it means that the Department may not seek to sanction schools for engaging in minor misrepresentations. The Department claims that its decision to delete that provision was administrative house keeping, *see* Final Regulations, 75 Fed. Reg. at 66,915, and that it will pursue enforcement taking into account aggravating and mitigating factors, *see id.* at 66,914–15. We have no reason – beyond Appellant's speculation – to think otherwise, and such speculation cannot be the basis for declaring the regulations facially invalid.

Appellant might instead be making the broader argument that the regulatory definition of "substantial misrepresentation" exceeds the HEA's limits by omitting a "materiality or objective reliance requirement." Appellant's Br. at 44. The Misrepresentation Regulations use the same definition of "*substantial misrepresentation*" that the Department has used for over thirty years: "Any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Compare* 34 C.F.R. § 668.71(c) (2011), *with* 34 C.F.R. § 668.62 (1981). Appellant claims that the definition should instead be: any misrepresentation on which "a reasonably prudent person would rely." Appellant's Br. at 45. This argument is unpersuasive. It lacks entirely the hallmarks of *Chevron* analysis – recourse to the plain meaning of text, legislative history, context, etc. – and rests instead on speculation. To prevail on its facial challenge, Appellant must demonstrate that there is no set of circumstances under which the Department's interpretation of "substantial misrepresentation" can be applied lawfully. Appellant cannot possibly satisfy this standard.

2.   The Regulations Are Not Unconstitutional

Appellant argues that the Misrepresentation Regulations impermissibly prohibit both core political speech and protected commercial speech. We disagree.

- *Noncommercial Speech*

The Misrepresentation Regulations set forth that the Department may sanction an institution for making a misrepresentation "directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary." 34 C.F.R. § 668.71(c) (2011). Appellant claims that the regulations suppress core First Amendment speech, specifically by authorizing the Department to sanction a statement made "'directly or *indirectly* to . . . any member of the public' . . . even if made with the best intentions and completely outside of any advertising context." Appellant's Br. at 47 (first and second alterations in original) (citation omitted). To illustrate the breadth of the regulations, Appellant offers the example that the Department could invoke section 668.71(c) to sanction an institution for statements made by its president during a public debate about education policy.

If Appellant were correct that the regulations apply to all of an institution's communications to "the public," then we would have some misgivings about the regulations' constitutionality. But we think that Appellant's interpretation cannot be squared with the regulations, when read as a whole and in context. Furthermore, a law "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996) (citation omitted) (internal quotation marks omitted). We therefore interpret the regulations facially to reach only "commercial speech" – at least insofar as statements to "the public" are concerned. And because Appellant's position is linked exclusively to the potential application of the regulations to statements to the public, we have no occasion to address the scope of the regulations, insofar as statements to other entities, such as state accrediting agencies or the Secretary, are concerned.

The Supreme Court has defined "commercial speech" to be "expression related solely to the economic interests of the speaker and its audience," as well as "speech proposing a commercial transaction." *Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561, 562 (1980). This court has added that "material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product" also can qualify as commercial speech. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (per curiam) (citations omitted). We construe the regulations facially to apply to nothing more.

As a threshold matter, a number of contextual clues make it clear that – at least with respect to communications to the public – the regulations encompass only advertisements, direct solicitations, and other promotional and marketing materials and statements. For example, the only parties prohibited from engaging in misrepresentation under the regulations are "the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, *marketing, advertising*, recruiting or admissions services." 34 C.F.R. § 668.71(b) (2011) (emphasis added). Additionally, in describing the forms of proscribed misrepresentations, the regulations specifically list only those "made in any *advertising, promotional materials, or in the marketing or sale* of courses or programs of instruction offered by the institution." *Id.* (emphasis added). And finally, the Department's explanation for adopting the regulations supports our reading. *See* Final Regulations, 75 Fed. Reg. at 66,913–14 (documenting that the regulations are a response to "overly aggressive advertising and marketing tactics" and summarizing a study of "fraudulent, deceptive, or otherwise questionable marketing practices").

We understand that "[t]he mere fact that [statements] are

conceded to be advertisements clearly does not compel the conclusion that they are commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted). However, when statements reference particular services or products, and when they are offered to advance the economic interests of the institution, they "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues." *Id*. at 67–68. "[A]dvertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech. [An institution] has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of" promoting a service or product. *Id.* at 68 (footnote omitted) (citations omitted) (internal quotation marks omitted). "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id*. (citation omitted).

As Appellant points out, commercial speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). Thus, when the government seeks to restrict *inextricably intertwined* commercial and noncommercial speech, courts must subject the restriction to the test "for fully protected expression." *Id.* But even if the regulations create the possibility that the Department could sanction an institution's misrepresentations made in the context of mixed commercial and noncommercial speech – or contained in a purely informational pamphlet that does not qualify as commercial speech at all – that possibility, without more, does not require facial invalidation of the regulations. *See, e.g.*, *Reno* 507 U.S. at 301; *Sherley*, 644 F.3d at 397. If the Department ever overreaches, schools will be able to challenge particular applications as unconstitutional.

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) is not to the contrary. There, on a facial challenge, the Supreme Court invalidated state regulations of speech without expressly following *Reno*'s no-set-of-circumstances test. But because the regulations at issue were conceded facially to encompass purely *protected* speech, *see id.* at 555, the state bore the burden of demonstrating that the regulations were tailored to achieve the state's purpose, *see id.* at 561. The regulations were not so tailored, hence their facial invalidation. *See id.* at 561–66. Here, however, we face the inverse situation. The regulations reach only commercial speech; and we have vacated the regulations insofar as they reach anything other than false, erroneous, or deceitful commercial speech. Therefore, Appellant's argument that the regulations could be applied unlawfully is precisely the kind of argument that is disfavored in the posture of a facial challenge.

Nor does the "overbreadth" doctrine save Appellant's challenge. At the outset, it is not clear that Appellant is entitled to invoke the overbreadth doctrine here. That doctrine is intended to prevent the chilling of speech by allowing a plaintiff to challenge a restriction, even if the restriction could be lawfully applied to that plaintiff. But the Supreme Court has recognized that chilling is unlikely where, as here, the speech is "the offspring of economic self-interest," because such speech "is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Cent. Hudson*, 447 U.S. at 564 n.6 (citation omitted).

But even were we to consider Appellant's overbreadth challenge, we would reject it. In bringing an overbreadth attack, a plaintiff bears the burden of demonstrating that the challenged law reaches a "'substantial' amount of protected free speech, 'judged in relation to the [regulations'] plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003). The Court established this high threshold because

there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law – particularly a law that reflects "legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." For there are substantial costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct. To ensure that these costs do not swallow the social benefits of declaring a law "overbroad," we have insisted that a law's application to protected speech be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the "strong medicine" of overbreadth invalidation.

*Id.* at 119–20 (citations omitted).

Appellant has failed to satisfy this standard. The Misrepresentation Regulations clearly serve a legitimate state interest: ensuring that schools receiving federal funds do not deceive prospective students into accepting loans that they cannot repay. And we have no basis to think that the regulations' potential application to noncommercial speech will be substantial in either the absolute sense or relative to their application to unprotected commercial speech.

• *Commercial Speech*

"[C]ommercial speech enjoys First Amendment protection only if it . . . is not misleading." *Whitaker v. Thompson*, 353 F.3d 947, 952 (D.C. Cir. 2004). Furthermore, misleading commercial speech is not only subject to restraint; "[it] may be prohibited entirely." *In re R. M. J.*, 455 U.S. 191, 203 (1982); *see also Cent. Hudson*, 447 U.S. at 563 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful

activity. The government may ban forms of communication more likely to deceive the public than to inform it . . . ." (citations omitted)). Appellant argues that even if the Misrepresentation Regulations reach only commercial speech, they are still impermissible. But its position is predicated entirely on the fact that section 668.71(c) interprets the HEA to reach statements that have the "tendency or likelihood . . . to confuse." *See* Appellant's Br. at 51–54. We have already vacated that provision, insofar as it reaches merely confusing statements. And since the regulations now facially reach only false statements, erroneous statements, or statements that have the likelihood or tendency to *deceive*, there can be no doubt that the regulations are constitutional: They regulate speech that is not entitled to protection in the first place.

## D. The State Authorization Regulations

### 1. The School Authorization Regulation Is Valid

The school authorization regulation sets forth that an institution is legally authorized within a state only if "the state has a process to review and appropriately act on complaints concerning the institution" and if "[t]he institution is established by name as an educational institution by a State through" one of several specifically designated actions. 34 C.F.R. § 600.9(a)(1)(i)(A) (2011). The District Court held that Appellant lacks standing to challenge these requirements. *See Career Coll. Ass'n*, 796 F. Supp. 2d at 133 n.16. We reverse on that point.

To have standing to seek injunctive relief,

[Appellant] must show that [it] is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of [Appellee]; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (citation omitted). Where, as here, the challenged regulations "neither require nor forbid any action on the part of [the challenging party]," – *i.e.*, where that party is not "the object of the government action or inaction" – "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* (citation omitted) (internal quotation marks omitted). In such situations, the challenging party must demonstrate that "application of the regulations by the Government will affect [it]" in an adverse manner. *Id.*

Appellant satisfies this standard. "If States bend to the Department's will, [Appellant's] members are harmed because they will face even greater compliance costs." Appellant's Br. at 55. That injury is not speculative or conclusory; indeed, even the Department implicitly recognized it. *See* Final Regulations, 75 Fed. Reg. at 66,859 ("Since the final regulations only establish minimal standards for institutions to qualify as legally authorized by a State, we believe that, in most instances, they do not impose *significant* burden or costs." (emphasis added)). Alternatively, "[i]f the States ignore the regulations, [Appellant's] members will be barred from Title IV programs through no fault of their own. Whatever States do in response to the regulations, [Appellant]'s members will suffer cognizable injury." Appellant's Br. at 55 (citation omitted).

- *Statutory Authority*

Appellant's primary argument is that the Department lacked authority to promulgate the school authorization regulation. Appellant argues that

[t]he Department can point to nothing in the HEA that empowers it to dictate to States how to "authorize" institutions of higher education. Oversight of education has long been a state prerogative, and it is well established that agencies may not alter the allocation of power between

> federal and state governments in a traditional area of state concern unless Congress has clearly authorized them to do so.

Appellant's Br. at 56 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991)).

We find this argument unpersuasive for two reasons. *First*, the school authorization regulation does not impose any mandatory requirements on states. In *Gregory*, the Court confronted whether the Federal Age Discrimination in Employment Act ("the ADEA") covered state judges, such that they could challenge a state constitutional provision requiring their retirement. *See* 501 U.S. at 455–56. The Court explained that to interpret the law in such manner would interfere with a "decision of the most fundamental sort for a sovereign entity." *Id.* at 460. Here, by contrast, the regulations merely establish criteria for schools that choose to participate in federal programs. *See* Final Regulations, 75 Fed. Reg. at 66,858 ("The proposed regulations do not seek to regulate what a State must do, but instead considers [sic] whether a State authorization is sufficient for an institution that participates, or seeks to participate, in Federal programs.").

This difference is constitutionally significant, because in *Gregory* the Court was concerned with congressional overreach in an area of state concern pursuant to Congress's powers under the Commerce Clause. Congress unquestionably enacted the ADEA pursuant to its commerce powers, *see Gregory*, 501 U.S. at 464, and the Court in *Gregory* justified adopting a plain statement rule on the basis that "[a]s against [*those*] powers . . ., the authority of the people of the States to determine the qualifications of their government officials may be inviolate." *Id.* (emphasis added) (citation omitted). In contrast, Congress enacted the HEA pursuant to its spending power. "Incident to [that] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further

broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and *administrative directives*.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (emphasis added) (citations omitted).

We are not aware of any case in which a court has applied *Gregory* to an exercise of Congress's spending power. This absence of authority is hardly surprising: The Supreme Court has consistently maintained that more permissive limitations apply when Congress acts pursuant to its spending powers than when it acts pursuant to its commerce power. *See id.* at 209 ("[T]he constitutional limitations on Congress when exercising its spending power are less exacting than those on its authority to regulate directly.").

We understand that the Supreme Court's spending power case law is not directly apposite, because states are not the recipients of federal funds under the HEA; schools are. But the school authorization regulation's requirements are more analogous to conditions on federal grants to states than they are to direct requirements on states, if for no other reason than that the decision of whether to comply actually rests with the states. And we have no basis to think that the Department's presenting states a noncoercive choice somehow "upset[s] the usual constitutional balance of federal and state powers," *Gregory*, 501 U.S. at 460.

*Second*, the *Gregory* rule is not inviolate, and we see no reason to apply it here. This court has suggested that the rule might apply in instances in which an agency regulates in an area of state oversight – for example, the practice of law – without plain authorization from Congress. *See Am. Bar Ass'n v. FTC*, 430 F.3d 457, 471–72 (D.C. Cir. 2005). But the Supreme Court has also upheld federal regulation of activity in those same areas of state concern. *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1331–33 (2010) (holding that Bankruptcy Abuse Prevention and Consumer Protect Action of

2005 plainly covers lawyers as "debt relief agencies"). Moreover, Appellant's claim that "[o]versight of education has long been a state prerogative," Appellant's Br. at 56, is a non sequitur in the context of a federal program in which the Department has clear oversight responsibility. *Cf. Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 778 (1st Cir. 2000) ("This is a federal program, federal dollars are at stake, and the most sensible reading of the statute is that the Secretary has discretion to determine what is 'legal authorization' in order to protect federal interests.").

• *Reasoned Decisionmaking*

Appellant also argues that the school authorization regulation is arbitrary and capricious – because it is "not a solution to any problem" in the record, and because it "penalize[s] *schools and their students* for the failure of *States* to adopt compliant authorization regimes even though schools and their students obviously cannot control States' compliance." Appellant's Br. at 58–59. As noted, our review of agency regulations is deferential, especially where the administrative action "involve[s] legislative-type policy judgments." EDWARDS & ELLIOTT 172 (citation omitted). During the rulemaking, the Department identified three problems that the regulation addresses. We can find no basis, and Appellant offers none, to set aside the agency's policy judgment.

First, the agency was concerned that the historical lack of state oversight had prompted "movement of substandard institutions and diploma mills from State to State in response to changing requirements." NPRM, 75 Fed. Reg. at 34,813. The Department reiterated and amplified this concern in the final rulemaking, describing that it had "anecdotally observed institutions shopping for States with little or no oversight." Final Regulations, 75 Fed. Reg. at 66,859. This court has said that while we "accord deference to a determination by [an agency] that a problem exists within its regulatory domain, [that]

deference is not a blank check." *Alltel Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988). Furthermore, we have warned that even plausible claims of "abuse" can fall short where an agency offers no demonstration that "such abuse exists" or that a challenged rule "targets [entities] engaged in such abuse." *Id.* at 560. But we think that, in this case, the Department has offered more than a conclusory assertion of abuse. Furthermore, the record certainly bears out that institutions have engaged in other deceptive practices, and the Department was entitled to adopt this regulation as a prophylactic response to burgeoning forms of abuse.

Second, the Department was apparently concerned that the absence of specific authorization requirements had "contributed to the recent lapse in the existence of California's Bureau for Private Postsecondary and Vocational Education." NPRM, 75 Fed. Reg. at 34,813. Commenters asked whether this "lapse" had produced any actual harm to California's students, and the Department's answer certainly leaves something to be desired. The agency responded that it had been informed of at least one instance of a school's shutting down during the lapse, and it asserted that "the absence of a regulation created uncertainty." Final Regulations, 75 Fed. Reg. at 66,859. It further suggested that other problems might have occurred. *See id.* But the Department also provided some explanation for why it believed that such lapses could present risks to students in the future, and why the regulation would likely prevent states from allowing similar lapses, lest their institutions lose Title IV eligibility. Those explanations are sufficient.

Third, the agency was concerned that states were "deferring all, or nearly all, of their oversight responsibilities to accrediting agencies," thereby "[compromising] the checks and balances provided by the separate processes of accreditation and State legal authorization." NPRM, 75 Fed. Reg. at 34,813. The Department offered a similar explanation in the final

rulemaking. *See* Final Regulations, 75 Fed. Reg. at 66,864. Here too, we understand the Department to be justifying the regulation – and the dual authorization-accreditation requirements – as a prophylactic component to a larger regulatory regime. We are unwilling to second-guess the Department's policy judgment in that regard.

The Department also offered two justifications for its decision to revoke *schools*' eligibility for *states*' failure to adopt compliant authorization procedures. First, the agency claimed that the HEA compels that outcome by requiring schools to be legally authorized. It noted that the HEA separately requires schools to be "accredited," 20 U.S.C. § 1001(a)(5), even though institutions lack control over accrediting agencies. The Department therefore claimed that an institution in a state which has not complied with the school authorization regulation is not "any different than an institution failing to comply with an accreditation requirement that results in the institution's loss of accredited status." Final Regulations, 75 Fed. Reg. at 66,859.

Second, the Department explained why it is likely that states will comply with the school authorization regulation's requirements, such that most schools will not lose their eligibility. *See id.* at 66,863 ("States may meet this requirement in a number of ways, and also with different ways for different types of institutions. . . . We believe that the provisions . . . are so basic that State compliance will be easily established for most institutions."). But the agency also concluded that "[u]nless a State provides at least this minimal level of review, we do not believe it should be considered as authorizing an institution to offer an education program beyond secondary education." *Id.* This conclusion is precisely the type of policy judgment that an agency is entitled to make.

2. The Distance Education Regulation Violates the APA

The distance education regulation establishes specific

requirements for schools that offer distance education. It sets forth that a school offering education "to students in a State in which it is not physically located . . . must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State." 34 C.F.R. § 600.9(c) (2011). The District Court held that the regulation violated the APA, because the Department had failed to provide adequate notice of the rule to regulated parties. *See Career Coll. Ass'n*, 796 F. Supp. 2d at 133–35; *see also* 5 U.S.C. § 553(b)(3) (requiring agencies to provide notice of proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved"). We agree.

This court succinctly summarized the governing standard for the APA's notice requirement in *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076 (D.C. Cir. 2009):

> [T]he NPRM and the final rule need not be identical: "[a]n agency's final rule need only be a 'logical outgrowth' of its notice." A final rule qualifies as a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where "interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule."

*Id.* at 1079–80 (second and third alterations in original) (citations omitted).

The Department does not point to anything in its Notice of Proposed Rulemaking that specifically addressed distance education. Nor did the Department solicit comments about the adoption of such a rule. These failures cut against the Department's claim that the distance education regulation is a

logical outgrowth of the proposed rules. *See id.* at 1081. More importantly, we find the Department's claims that parties should have anticipated the regulation wanting.

First, the Department emphasizes that whereas the previous regulations required authorization "in the State in which the institution is physically located," 34 C.F.R §§ 600.4(a)(3), 600.5(a)(4), 600.6(a)(3) (2010), the proposed regulations stated that the HEA requires authorization "from the States where [institutions] operate to provide postsecondary educational programs," NPRM, 75 Fed. Reg. at 34,812. But, as Appellant points out, the word "operate" is not a term of art that clearly refers only to distance education providers; "[m]any brick-and-mortar programs 'operate' in several physical locations." Appellant's Reply Br. at 58. Appellant's members thus had no way of knowing that the Department was contemplating specific requirements for distance education providers. The agency counters that "if the proposed regulation gave fair notice that the Department was considering changing its 'physically located' rule . . ., and such a change has obvious relevance to distance education programs . . ., then it is irrelevant that the proposed change might *also* have relevance for brick-and-mortar schools as well." Gov't's Reply Br. at 7. But the critical point is that "operate" is, at best, an oblique – and hence, insufficient – indication that the Department was considering the distance education regulation.

Second, the Department claims that its repeated references to "reciprocal agreements between appropriate State agencies," in the proposed regulations, NPRM, 75 Fed. Reg. at 34,813, and during the negotiated rulemaking proceedings provided notice that the Department was contemplating regulation of distance and correspondence education. But this argument suffers from the same shortcomings as the Department's first argument. The reason the reference to reciprocal agreements did not put parties on notice of the eventual regulation is that such agreements

would be equally applicable to brick-and-mortar institutions with locations in multiple states.

Third, the Department claims that "various commenters took the proposed regulation . . . as contemplating a requirement for state authorization beyond where a school is physically located." Gov't's Br. at 67 (citation omitted). This court has made clear that "[t]he fact that some commenters actually submitted comments" addressing the final rule "is of little significance. . . . [T]he [agency] must *itself* provide notice of a regulatory proposal." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (citations omitted) (internal quotation marks omitted). The Department seeks to avoid this instruction by expressly not arguing that interested parties received notice from other parties' comments; instead, it claims that the fact that parties commented demonstrates that the Department provided adequate notice. But at least some of the commenters that the Department cites merely requested clarification as to the Department's new language without offering evaluations of the final rule. *See* Letter from ITT Technical Inst. to Jessica Finkel 1–2 (July 30, 2010), J.A. 345–46. Therefore, we cannot conclude that the "purposes of notice and comment have been adequately served." *Fertilizer Inst.*, 935 F.2d at 1311 (citation omitted).

Finally, the Department argues that in the proposed regulations, it made clear its intent to impose, for the first time, substantive requirements related to the legal authorization of institutions by states. The Department urges that institutions were therefore put on notice that authorization requirements for distance education programs were possible. We agree that the "final rule did not amount to a complete turnaround from the NPRM." *CSX Transp., Inc.*, 584 F.3d at 1081–82. But the APA simply requires more.

The Department does not challenge that its failure to provide notice was prejudicial to Appellant, which never had the

chance to explain why, in its view, the rule exceeded the HEA's limits or was arbitrary and capricious. *See id.* at 1083 (finding that parties "were prejudiced by their inability to persuade the [agency] not to adopt the . . . rule in the first place"). We are thus constrained to affirm that section 600.9(c) violates the APA and must be vacated.

## III.   Conclusion

For the foregoing reasons, the judgment is affirmed in part and reversed in part. The case is remanded to the District Court with instructions to remand the challenged regulations to the Department for reconsideration consistent with this opinion.

*So ordered.*