ROGERS, Circuit Judge,
dissenting:
Because Congress “has directly spoken to the precise question at issue,” Chevron USA Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court’s job is done. Instead, the court defers to the Secretary’s interpretation, contrary to the plain text of the Endangered Species Act (“ESA”), 16 U.S.C. §§ 1531-1544, that the West Virginia Northern Flying Squirrel (“Squirrel”), an endangered species, loses all protections even though the recovery criteria in its recovery plan have not been met and those criteria are revised, while the Squirrel was listed as endangered, without required notice and prior consideration of public comments. But even assuming, as the court concludes, the ESA is ambiguous, the Secretary was arbitrary and capricious in delisting the Squirrel based in material part on an analysis revising the recovery plan criteria that was not publically noticed until the final delisting rule, and then only on the basis of available scientific and commercial evidence showing the Squirrel persists (i.e., is not yet extinct) as distinct from recovered so as no longer to require ESA’s protections. Accordingly, I respectfully dissent.
I.
“As in all statutory construction cases,” the court must “begin with the language of the statute.” Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). “[CJourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.” Id. at 461-62, 122 S.Ct. 941 (quoting Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal quotation marks and citation omitted)). Congress’s requirements in the ESA for delisting an endangered species for which the Secretary of the Interior has developed a recovery plan are unambiguous with respect to when that species is eligible for delisting and to the procedure for revising announced recovery plan criteria.
Section 4(f) provides:
(1) The Secretary shall develop and implement [recovery plans] for the conservation and survival of endangered species and threatened species____ The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—
(B) incorporate in each plan—
(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.
(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.
*441 16 U.S.C. § 1533(f) (emphases added). These substantive and procedural requirements reflect Congress’s finding that “various species of ... wildlife,” such as the Squirrel, “are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people,” id. § 1531(a)(3), and adoption of a policy of conservation, id. § 1531(c), which is defined as use of the “methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary,” id. § 1532(3). Applying the traditional, well-settled standards for statutory interpretation,[1] it is difficult to imagine how Congress could have spoken more clearly and directly when it strengthened the ESA in 1988, see Pub.L. No. 100-478, 102 Stat. 2306, by mandating both development and implementation, prior to delisting, of recovery plans that include “objective, measurable criteria,” 16 U.S.C. § 1533(f)(l)(B)(ii), and the procedures for their amendment, id. § 1533(f)(4). See S.Rep. No. 100-240, at 4 (1987), reprinted in 1988 U.S.C.C.A.N. 2700, 2703 (noting that “far too many recovery plans for listed species have not been implemented ... [and] recovery plans have failed to include consistently criteria, time frames and estimated costs for recovery”).
The plain text of section 4(f) answers the questions of whether recovery plans are discretionary, what they must contain, what process must be followed for their adoption and revision, and whether recovery plan criteria must be met before delisting procedures are initiated. First, section 4 provides that the Secretary “shall” implement recovery plans. When Congress uses the word “shall,” it intends to communicate a mandatory action. See Gonzalez v. Thaler, — U.S. -, 132 S.Ct. 641, 651,181 L.Ed.2d 619 (2012). “It is fixed law that words of statutes or regulations must be given their ordinary, contemporary, common meaning. It is also fixed usage that ‘shall’ means something on the order of ‘must’ or ‘will.’ ” FTC v. Tarriff, 584 F.3d 1088, 1090 (D.C.Cir.2009) (internal quotation marks and citations omitted). Looking to the usual understanding of the words used by Congress, to “implement” is “to give practical effect to and ensure of actual fulfillment by concrete measures.” Merriam Webster’s Collegiate Dictionary 583 (10th ed.1993). Thus, section 4(f)(1) “is not at all ambiguous, but instead is exquisitely clear,” Ctr. for Biological Diversity v. Norton, 254 F.3d 833, 837 (9th Cir.2001) (interpreting ESA section 4(b), 16 U.S.C. § 1533(b)(3)(A)), in requiring the Secretary to ensure the actual fulfillment of species’ recovery plans prior to delisting. Where, as here, the Secretary seeks to delist a species whose initial recovery plan criteria have not been met, section 4(f)(4)’s procedures for revising the recovery plan *442 must be followed. This is the only reading of section 4 of the ESA that does not render the mandatory requirements of subsections (f)(1) and (f)(4) superfluous. See Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009).
Eschewing the plain text, the court finds ambiguity for three reasons. First, the court notes that the word “shall” does not appear in section 4(f)(l)(B)(ii) with respect to whether the “objective, measurable criteria” to be included in the recovery plan control delisting. See Op. at 433. Second, this purported ambiguity is “magnified,” the court states, because the Secretary’s obligation to include such criteria in a recovery plan is qualified by the phase “to the maximum extent practicable.” See id. at 433. Third, the court asserts that other “ ‘traditional tools of statutory construction,’ Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778, do not reveal any more clearly the intent of Congress on this question.” Id. These reasons do not withstand examination.
The first reason erases “(f)(1)” from “(f)(l)(B)(ii)” and ignores English grammar. The court blinds itself to the introductory provision, which provides that the Secretary “shall develop and implement” recovery plans, which “shall ... incorporate” the criteria in (B)(ii), 16 U.S.C. §§ 1533(f)(1) & (f)(1)(B). Subsection (B)(ii) cannot exist dissected from its introductory text in (f)(1); (B)(ii) is not even a complete sentence without (f)(1). At some point Congress surely is permitted to avoid being duplicative (triplicative?). Likewise, the grammatical structure of subsection (f)(l)(B)(ii) is in a simple future conditional tense. Plans that shall contain “objective, measurable criteria which, when met, would result in a determination ... that the species be removed from the list,” id. § (f)(l)(B)(ii) (emphasis added), shall be implemented. The condition — the time at which the recovery criteria are met — is followed by the consequence — a determination to delist the species.[2] Adding a third “shall” to this sentence does not change its plain meaning, nor would it make sense given the simple condition-consequence structure of the sentence. The court agrees the Secretary has mandatory duties, Op. at 436-37, but then disregards the import of its agreement finding ambiguity when there is none. As a further example, the court suggests the possibility that the phrase “would result” could mean “a sufficient, not a necessary” condition. Id. at 437. But “the sort of ambiguity giving rise to Chevron deference is a creature not of definitional possibilities, but of statutory context.” New York v. EPA, 443 F.3d 880, 884 (D.C.Cir.2006), and a court “must not ‘confine [itself] to examining a particular statutory provision in isolation.’ ” Am. Bankers Ass’n v. Nat. Credit Union Admin., 271 F.3d 262, 267 (D.C.Cir.2001). It hardly would make sense for Congress to mandate implementation, and formal procedures for revision, of criteria in recovery plans that “would result” in “the species be[ing] removed from the list” if Congress intended that other unadopted recovery criteria could suffice, and need not be formally adopted pursuant to the procedures Congress mandated, to determine delisting. The context and structure of the statute are clear that the recovery criteria must be “met” or revised prior to delisting. And, upon “exhausting the traditional tools of statutory construction, including examining the statute’s legislative history,” id., that history “definitively resolves the debate,” id., the court creates over the word “would” for *443 Congress stated that the 1988 amendments added “[t]he requirement that plans contain objective, measurable criteria for removal of a species from the Act’s lists.” S.Rep. No. 100-240, at 9-10 (emphasis added); see infra n. 4.
Next, the court attempts to 'find ambiguity in the phrase “to the maximum extent practicable.” Section 4(f)(1) provides that “[t]he Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable ... incorporate in each plan ... objective, measurable criteria.” 16 U.S.C. § 1533(f)(l)(B)(ii) (emphasis added). Any potential ambiguity evaporates where, as here, the Secretary has incorporated objective criteria in the Squirrel’s recovery plan.[3] It obviously was practicable to do so here. Having done so, the Secretary is not free to ignore Congress’s mandates to “implement” plans and to delist only “when”, the objective criteria are “met,” particularly, given his determination, in developing the recovery plan, that the plan “will •... promote the conservation,” 16 U.S.C. § 1533(f)(1), of the Squirrel. The court protests ambiguity remains because the word “implementing” means “the Secretary must incorporate criteria that are practicable to implement.” The court explains, otherwise “any imaginable criterion may be incorporated so long as the agency has the wit to place the requisite words upon a page.... [I]t would be ‘impracticable’ for the Secretary to adopt criteria that by their nature could never be met and hence would preclude delisting a species so long as those criteria remain in effect.” Op. at 438. This is word play, not statutory analysis. As Congress crafted the ESA, the Secretary’s chosen criteria; once “incorporate[d] in each plan,” remain “incorporate[d] in each plan,” however “practicable” their adoption might once have been, or their implementation might later become, and Congress provided a remedy for the latter possibility — revision pursuant to public notice-and-comment. See 16 U.S.C. § 1533(f)(4). The recovery criteria, therefore, plainly cannot .“preclude delisting a species” because .they can be changed, with notice-and-comment, if the Secretary determines “they could never be met”.or no longer accurately measure recovery. The. court either overlooks section 4(f)(4)’s revision process or drains it of purpose. Furthermore, even if the Secretary could “decide it is .practicable only to adopt criteria that guide but do not constrain [the delisting] analysis,” Op. at 438, that is not what happened here. The Squirrel’s recovery plan states that “Recovery plans delineate reasonable actions believed to be required to recover and/or protect listed species,” and notes that recovery plans are subject to amendment— which is consistent with section 4(f)(4). Recovery Plan, Executive Summary (emphasis added). Indeed, the Secretary specified that the first three criteria were required for down-listing the Squirrel to “threatened” status, while the fourth, in combination with the first three, were required for delisting. Id. The court’s search for ambiguity here is in vain.
*444 The third reason the court finds ambiguity, which it collapses into a denial that its deference to the Secretary’s interpretation of sections 4(a) and (f) renders (f) a nullity, see Op. at 433-34, overrides Congress’s repeated use of “shall” in identifying the Secretary’s obligations and allows the Secretary to end run section 4(f)’s requirements. Rather than confront Congress’s plain mandatory text, or the supportive legislative history,[4] the court turns to a travel planning analogy that distorts what happened here. The court posits:
If someone said he would see me in Cleveland while on his way to Chicago and would let me know before changing his plan, it would hardly be sensible to say. he must “revise” his plan before he can tell me that he no longer needs to make the trip.
Op. at 434. Here, the Secretary in fact went to Chicago — he declared the Squirrel recovered and delisted it. He just avoided Cleveland altogether (i.e., several of the recovery criteria), and stopped in Detroit instead (i.e., the covertly revised criteria), without telling anyone, despite saying he “would let me know before changing his plan” (i.e., comply with section 4(f)(4)). The court’s analogy begs the key question of how it is to be determined that the stop in Cleveland (i.e., meeting the recovery criteria) no longer needs to occur — as Congress directed, or as the Secretary would prefer? A better analogy, grounded in administrative law, is of an airline pilot who determines mid-flight, due to changed circumstances (e.g., turbulence), that the approved flight plan should be revised. Although “overtaken by events,” Op. at 434, under the regulations, in the absence of an emergency, the flight plan may not be discarded by the pilot — instead the pilot must follow the revision process set forth by regulations. See 14 C.F.R. § 91.123 (“[N]o pilot in command may deviate from [a] clearance unless an amended clearance is obtained....”). Congress provided no comparable “emergency” exception in the ESA whereby the Secretary may disregard the recovery plan criteria if he decides, insulated from public input, that the *445 species has in fact recovered despite not satisfying the official plan criteria for recovery. Instead, Congress specified in the ESA the process for revising recovery plans.
Furthermore, the court altogether ignores that the Secretary, acting through the Fish and Wildlife Service (“FWS”), revised the recovery plan, while the Squirrel was still listed as endangered, without following the notice and comment procedures required by ESA section 4(f)(4). In December 2007, nearly a year before promulgating the Final Rule Removing the Squirrel from the Endangered Species List, 73 Fed.Reg. 50,226 (Aug. 26, 2008) (“Final Rule”), the FWS revised two of the four criteria in the Squirrel’s recovery plan. In an unpublished, publically-unavailable analysis, the FWS concluded that the second and fourth recovery criteria had been met, while the “intent” of the first and third criteria had been met under revised criteria. See U.S. Fish & Wildlife Service, Analysis of Recovery Plan Criteria for the West Virginia Northern Flying Squirrel 13 (Dec. 18, 2007) (“2007 Analysis”). Specifically, the FWS revised the first criterion from one measuring Squirrel populations in five geographic areas to one measuring “persistence,” that is, whether the Squirrel was present (without regard to quantity) or absent, in 3-5 year intervals, in different areas.[5] See id. at 2. The FWS revised the third criterion to eliminate its core provision that the geographic recovery area (“GRA”) be managed in perpetuity.[6] It is undisputed the FWS made these revisions without providing notice or opportunity for comment, and that the 2007 Analysis was publically mentioned for the first time in the Final Rule, 73 Fed.Reg. at 50,227. Even were the court correct that the purported ambiguity of section 4 permits the Secretary’s interpretation of recovery plans as discretionary and mere guidance (contrary to the ESA’s plain text) and that the Secretary did not need to revise the recovery plan if its criteria could not be met, see Op. at 434, where the Secretary does revise the plan, the court has no explanation for why the requirements of section 4(f)(4) can be ignored, other than to invoke its inapt travel plan analogy.
The circularity of the court’s reasoning demonstrates how its reading renders section 4(f) superfluous: According to the court: “[A]s long as a species is listed as endangered, the agency is obligated to work toward the goals set in its recovery plan,” but the “criteria in the plan [do not] limit the agency when it is deciding whether to delist a species.” Op. at 437. If a species is delisted on the basis of recovery, *446 without regard to whether the recovery plan criteria have been “met,” then there is nothing left to section 4(f)(4)’s mandatory requirement that revisions to the criteria by which recovery is evaluated be subject to notice and comment prior to their adoption. Under the court’s interpretation, the FWS, on the Secretary’s behalf, can dispense with the revision plan criteria by not labeling its changes a “revision,” and proceed to delist a protected species pursuant to section 4(a) without regard to the requirements of sections 4(f)(1) and (4). That the FWS would never have an incentive to follow the revision process of section 4(f)(4), because recovery plans could be ignored without consequence, is aptly demonstrated by the facts here: while the Squirrel was still listed as endangered, the FWS covertly changed its recovery plan criteria without following the requirements of section 4(f)(4).
Required procedures are a vital part of the protections afforded by the ESA, in which Congress employed mandatory language regarding the Secretary’s obligations. See, e.g., 16 U.S.C. § 1533(a)(3)(A) & (B) (setting procedures for designating and revising critical habitat); id. § (b)(3)(A)-(D) (setting procedures and time period for responding to petitions); id. § (b)(5) (setting procedures and time period for notice-and-comment on listing); id. § (b)(6) (setting time period for publishing final listing or delisting rule); id. § (c)(1) (setting requirements for what endangered and threatened lists must contain); id. § (f)(4) & (5) (setting procedures for revising recovery plans and considering public comments). Whether or not the court views Congress’s chosen process as unnecessary, see Op. at 434, “[the court’s] job is to interpret the methods that Congress chose to further its goals, not to devise methods of our own.” Consolidated Rail Corp. v. United States, 896 F.2d 574, 579 (D.C.Cir.1990). If, as the court asserts, this dissent “labors at length” about Congress’s use of the word “shall,” see Op. at 436, the “labor[ing]” has been for naught as the court chooses to acknowledge its force selectively, in fact only with respect to section 4(a)(1), see id. Furthermore, the court’s revision to section 4(f) does not make much sense for it has the decision to delist driving what the recovery criteria are rather than the recovery criteria driving the decision to delist. Consistent with Congress’s choice of words and purpose to strengthen the ESA in the 1988 amendments, the notice-and-comment process for the recovery plan should sensibly precede consideration of delisting. See 16 U.S.C. § 1533(f)(4) (“The Secretary shall consider all information presented during the public comment period prior to approval of the plan.”) (emphasis added).
Contrary to the Secretary’s suggestion in this court, the requirements added by Congress in 1988 to strengthen the ESA’s protections, see S. Rep. No. 100-240, at 8-9, are not a “make-work exercise” or mere “hoop-jumping,” Appellant’s Br. at 43. Instead, consistent with its ESA findings and policy of conservation, Congress determined to “require deliberation” when the existence of precious species have been found endangered or threatened. Congress instructed in plain terms that only upon subjecting proposed revisions to recovery plan criteria to the rigor of public comment would the Secretary (or the FWS) be in a position properly to assess proposed revisions and undertake to consider, upon applying the revised criteria, whether they are met and the protected species should be delisted pursuant to sections 4(a) and (b). After all, the purpose of notice-and-comment procedures is “to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas.” See *447 State of N.J., Dept. of Envtl. Protection v. EPA, 626 F.2d 1038, 1049 (D.C.Cir.1980) (internal quotation marks and citation omitted) (emphasis added). That the Secretary (or the FWS) may find these requirements inconvenient or view section 4(f)(4) as a “make-work” exercise is irrelevant, for “[w]hen a statute commands an agency without qualification to carry out a particular program in a particular way, the agency’s duty is clear; if it believes the statute untoward in some respect, then ‘it should take its concerns to Congress,’ for ‘[i]n the meantime it must obey [the statute] as written.’ ” Oceana, Inc. v. Locke, 670 F.3d 1238, 1243 (D.C.Cir.2011) (quoting Natural Res. Def. Council v. EPA 643 F.3d 311, 323 (D.C.Cir.2011)) (second and third alterations in original).
The court’s reliance on Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 72, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), is misplaced, see Op. at 434. In determining that Bureau of Land Management (“BLM”) land use plans were not binding documents, the Supreme Court relied on a statutory provision granting the Secretary leeway in implementing plans: “Title 43 U.S.C. § 1712(e) provides that ‘[t]he Secretary may issue management decisions to implement land use plans’ — the decisions, that is, are distinct from the plan itself.” Norton, 542 U.S. at 69-70, 124 S.Ct. 2373 (alteration in original). BLM regulations likewise provided that land use plans were “not a final implementation decision on actions which require further specific plans, process steps, or decisions.” Id. at 70, 124 S.Ct. 2373 (quoting 43 C.F.R. § 1601.0-5(k) (2003)). By contrast, the ESA includes no provision granting the Secretary leeway in issuing “management decisions” about implementing recovery plans, and unlike land use plans, which may lack specificity and process steps, Congress mandated that recovery plans contain “objective, measurable criteria” to be “met.” 16 U.S.C. § 1533(f)(l)(B)(ii). The court’s remaining citation is to out-of-circuit precedent providing no statutory analysis and relying on a case decided before the 1988 ESA amendments. See Op. at 434 (citing Fund for Animals v. Rice, 85 F.3d 535, 547 (11th Cir.1996) (citing Strickland v. Morton, 519 F.2d 467, 469 (9th Cir.1975))).
Viewing the ESA as a whole, see Dole v. United Steelworkers of Am., 494 U.S. 26, 42-43, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990), — and consistent with “one of the most basic interpretative canons, that ‘[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant,’ ” Corley, 556 U.S. at 314, 129 S.Ct. 1558 (internal citation omitted) (alteration in original) — there is only one statutory reading that gives full effect to all of section 4’s provisions. For this reason, section 4(c)(2), which provides that determinations to remove a species from the list of endangered or threatened species be “made in accordance with the provisions of subsections (a) and (b),” 16 U.S.C. § 1533(c)(2), must be read in light of Congress’s 1988 amendment to section 4(f) to strengthen protections for species. “[W]hen” the existing or properly revised recovery criteria have been “met,” delisting is to occur pursuant to section 4(a) and (b). Where a species’ recovery plan criteria have not been met, the species remains listed. Where circumstances change, the recovery plan criteria may be revised in the manner prescribed by section 4(f)(4). Because section 4(f)(4) mandates notice be given prior to approval of a plan revision, and that public comments be considered before approval of a plan revision, section 4 is likewise unambiguous that the notice-and-comment period for plan revisions may not run concurrently with the notice-and-comment period for the proposed delisting rule.
*448 A statute that permits only one intelligible outcome is not ambiguous, and the court thus errs in deferring to the Secretary’s contrary interpretation, see Final Rule, 73 Fed.Reg. at 50,226, that recovery plans are discretionary and mere guidance documents whose recovery criteria do not inform delisting decisions. Because “the statutory language is unambiguous and the statutory scheme is coherent and consistent,” Barnhart, 534 U.S. at 450, 122 S.Ct. 941 (internal citations omitted), the court’s inquiry is at an end. For these reasons, I would affirm the judgment of the district court that the Secretary could not delist the Squirrel without either satisfying, or soliciting and considering public comments on the revisions to, the delisting criteria in the Squirrel’s recovery plan.
II.
Although the Secretary’s statutory challenge is properly resolved under Chevron step one, as there is no ambiguity for the Secretary to interpret, the court errs as well in rejecting appellees’ alternative argument that the Secretary violated the Administrative Procedure Act (“APA”). A delisting, no less than a “listing determination!,] is subject to review under the APA and must be set aside if ‘arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.’ ” Am. Wildlands v. Kempthorne, 530 F.3d 991, 997 (D.C.Cir.2008) (quoting 5 U.S.C. § 706(2)(A)).
A.
“Under APA notice and comment requirements, ‘[a]mong the information that must be revealed for public evaluation are the “technical studies and data” upon which the agency relies [in its rulemaking].’ ” Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 236 (D.C.Cir.2008) (quoting Chamber of Commerce v. SEC, 443 F.3d 890, 899 (D.C.Cir.2006)) (alterations in original). “More particularly, ‘[disclosure of staff reports allows the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it.’ ” Id. (quoting Nat’l Ass’n of Regulatory Util. Comm’rs v. FCC, 737 F.2d 1095, 1121 (D.C.Cir.1984)) (alteration and emphasis in original). “It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of ... data that, [in] critical degree, is known only to the agency.” Portland Cement Ass’n v. Ruckelshaus, 486 F.2d 375, 393 (D.C.Cir.1973), superseded by statute on other grounds, Am. Tracking Ass’ns, Inc. v. EPA, 175 F.3d 1027 (D.C.Cir.1999); see also Idaho Farm Bureau Fed’n v. Babbitt, 58 F.3d 1392, 1403 (9th Cir.1995).
1. In the Final Rule, the FWS relied heavily on the 2007 Analysis of the Squirrel’s recovery plan as the basis for eliminating the protections of the ESA for the species. See Final Rule, 73 Fed.Reg. at 50,227. It also relied on the 2006 5-Year Review.[7] See id. Neither the 2007 Analysis nor the 2006 5-Year Review were published in the Federal Register, see id.; indeed, the 2007 Analysis was created after the close of the public comment period on the proposed rule, see id., and counsel for the Secretary was unable during oral argument to indicate where a member of the public could gain access to the 2007 Analysis prior to, or even after, promulgation of the Final Rule. See Oral Arg., at 20:44-22:08.
Nor did the notice of proposed rulemaking to delist the Squirrel provide adequate substitute notice of the recovery plan revisions set forth in the 2007 Analysis. In *449 stead, although it generally outlined the FWS’s reasons for concluding recovery of the Squirrel had occurred, see Proposed Rule to Remove Squirrel From List of Endangered Species, 71 Fed.Reg. 75,924 (Dec. 19, 2006) (“NPRM”), the public had no opportunity to comment on the revisions of criteria one and three in the Squirrel’s recovery plan, including the definition of “persistence” in the 2007 Analysis and in the Final Rule. Neither, therefore, was there an opportunity for the FWS to consider, as Congress required, “all information presented during the public comment period [on the recovery criteria revisions],” 16 U.S.C. § 1533(f)(4), because no such comment period occurred. Even if the FWS was generally aware, through comments submitted in response to the NPRM, of criticisms of rejection of initial recovery plan criteria, “ ‘knowing’ is not, in any event, the same as actually considering the problems raised by” commenters. Gerber v. Norton, 294 F.3d 173, 183 (D.C.Cir.2002). The jettisoned procedures of section 4(f)(4) were designed to facilitate such consideration.
2. Furthermore, the NPRM gave no indication that the FWS intended to abandon “population” as the relevant standard in assessing the Squirrel’s recovery. “Given the strictures of notice-and-comment rulemaking, an agency’s proposed rule and its final rule may differ only insofar as the latter is a ‘logical outgrowth’ of the former.” Envtl. Integrity Project v. EPA, 425 F.3d 992, 996 (D.C.Cir.2005). “A rule is deemed a logical outgrowth if interested parties ‘should have anticipated’ that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.” Northeast Md. Waste Disposal Auth. v. EPA 358 F.3d 936, 952 (quoting City of Waukesha v. EPA 320 F.3d 228, 245 (D.C.Cir.2003)).
The NPRM solicited comments on four topics, three of which explicitly sought input on Squirrel population:
We particularly seek comments concerning: (1) Biological, commercial, trade, or other relevant data concerning any threat (or lack thereof) to the [Squirrel]; (2) additional information on the range, distribution, and population size of the [Squirrel] and its habitat; (3) the location of any additional populations of the [Squirrel]; and (4) data on population trends.
71 Fed.Reg. at 75,924 (emphases added). The NPRM sought no comments on the use of “persistence,” rather than population, as the relevant standard, see Ass’n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 461 (D.C.Cir.2012), and only vaguely referenced “presence” and “persistence,” see NPRM, 71 Fed.Reg. at 75,-926 (citing “strong evidence of the [Squirrel’s] continued presence throughout its range”); id. (citing ability of Squirrel to “adjust its foraging and denning behavior ... to persist in and around ... forest patches”); id. at 75,928 (citing Virginia laws as “ensuring] the [Squirrel’s] persistence in Virginia into the foreseeable future”); id. at 75,929 (noting that southern flying squirrel “does not appear to be affecting population persistence of the [Squirrel]”); id. at 75,929-930 (citing surveys showing Squirrel “persistent at multiple locations for multiple generations,” stating that “protected habitat should allow for persistence of viable populations” and concluding that “available information shows that the [Squirrel] is persisting throughout its historic range.”). The FWS nowhere indicated, contrary to the request for comments on population size, that “population” would be replaced as the recovery standard with “persistence” (or how “persistence” was to be defined). And two of the vague references to “persistence” fall in the same sentences in which NPRM *450 mentions “population.” See id. at 75,929-930.
Given the vague references to “persistence” and the explicit requests to comment on population size, interested parties were not reasonably apprised that they should submit comments on the use of “persistence,” rather than population, as the standard. The text of the NPRM provided no basis for anticipating that the FWS “considers persistence to be the best indicator of successfully reproducing populations for [the Squirrel],” Final Rule, 73 Fed.Reg. at 50,227. Yet the FWS’s reliance on “persistence,” and how it was to be defined, were critical shifts in the standard for the Squirrel’s recovery that presented the occasion for notice to the public so comments could address whether the FWS’s definition complied with the ESA’s stated purpose of “conservation” and the FWS could consider those comments before amending the recovery plan, much less completely delisting the Squirrel. The fact that some commenters criticized the lack of population data in the NPRM and the lack of a definition of “persistence,” see Final Rule, 73 Fed.Reg. at 50,227, cannot eliminate the FWS’s obligation to provide notice of its intent to substitute “persistence” for a “population” standard and of the definition of “persistence” and how it related to ESA’s policy of conservation. See Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C.Cir.1991). Having directed parties to focus on population size in their comments, the FWS may not “use the rulemaking process to pull a surprise switcheroo.” Envtl. Integrity Project, 425 F.3d at 996.
The court nowhere addresses these notice problems, despite the fact that this argument appears explicitly (and repeatedly) in appellees’ brief, see, e.g., Appellees’ Br. 36-40, with pin cite citations to and quotations from this circuit’s logical outgrowth doctrine cases. The argument is not, as the court concludes, see Op. at 438, forfeited.
B.
The court’s approval of the Secretary’s reliance on the Squirrel’s “persistence” as the standard for delisting, see Op. at 434-36, is also contrary to the repeated, unambiguous distinction in the ESA between conservation of a species and its mere survival, id. § 1532(3).
The FWS defined “persistence” as “continuing captures of [the Squirrel] over multiple generations at previously documented sites throughout its historical range,” Final Rule, 73 Fed.Reg. at 50,227; see also 2007 Analysis at 2. Stating that “analysis ... shows no evidence of localized extirpation since the [Squirrel] was listed” and that “[t]he [Squirrel] persists in or near all of the historical areas where it was originally known at the time of listing,” Final Rule, 73 Fed.Reg. at 50,229, the FWS determined that the Squirrel is not extinct and some (although unclear how many) continue to survive after multiple generations.
1. ESA section 4(b) requires that “[t]he Secretary shall make determinations ... solely on the basis of the best scientific and commercial data available.” 16 U.S.C. § 1533(b)(1)(A); see id. § 1533(c)(2). The court concludes the Secretary properly relied on available data on “persistence,” see Op. at 434-36, citing Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 60-61 (D.C.Cir.2000), which held that “the Secretary has no obligation to conduct independent studies.” But Southwest Center concerned a dispute over whether population estimates supported a decision to list a species, not over a shift in the relevant standard for determining whether to delist a species. In that case, the court approved the Secretary’s reliance on estimates of species’ population where an actual count was unavailable, noting that the *451 Secretary was not alleged to have “acted on the basis of no data.” Id. at 61. By contrast, here the Secretary delisted the Squirrel on the basis of “no data,” id. (emphasis added), regarding population. Instead, the Secretary shifted the standard from population numbers, see NPRM, 71 Fed.Reg. at 75,924; Recovery Plan at 18, to the Squirrel’s mere presence/persistence, Final Rule, 73 Fed.Reg. at 50,227, an entirely different concept. As appellees point out, see Appellees’ Br. at 49, “population” is a measure of quantity; “persistence” is a measure mere survival, or existence, of the species.
Indeed, one of the main reasons stated in the NPRM for delisting was the FWS’s conclusion that there had been “an increase in the number of individual squirrels.” NPRM, 71 Fed.Reg. at 75,924. In response to comments, however, the FWS acknowledged that “use of the phrase ‘increase in number if [sic ] individual [Squirrels]’ was not accurate, as [the FWS] ha[s] not estimated the size of the [Squirrel] population.” See Final Rule, 73 Fed.Reg. at 50,230. If there is no data available to answer the relevant question, section 4(b)(1)(A) does not permit the Secretary to answer another question that does have supporting data. The court’s reasoning presumes that the Secretary may begin with a conclusion (to delist) and then rely on some data remotely related to the species even if in answer to a question untethered to the ESA’s primary goal of recovery and conservation, to satisfy the “best ... data available” standard. The “best ... data available” standard cannot be used as an excuse to avoid implementing the recovery plan criteria. If the Secretary (or the FWS) concludes the available data suggests recovery but is insufficient to satisfy the recovery plan criteria, then the recovery plan must be revised in the manner prescribed by section 4(f)(4). This is the process Congress mandated, and it ensures that the criteria for recovery, and the data by which they are measured, are the best available.
2. Even assuming section 4(b)(1)(A) permitted the Secretary to change the standard used to measure a listed species’ recovery, the plain text of the ESA precludes the Secretary’s choice of “persistence.” The ESA defines “conservation” as “the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary.” 16 U.S.C. § 1532(3). It requires post-delisting monitoring for “all species which have recovered to the point at which the measures provided pursuant to [the ESA] are no longer necessary.” Id. § 1533(g)(1). As other circuits have recognized, Congress unambiguously required more than simply a species’ continued survival in determining whether it is to be protected under the ESA. In considering the Secretary’s regulations implementing the critical habitat provision, 16 U.S.C. § 1536(a)(2), the Ninth Circuit concluded that “the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted.” Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir.2004). “The purpose[ ] of [the ESA] ... [is] to provide a program for the conservation of [ ] endangered species and threatened species....,” 16 U.S.C. § 1531(b); consequently “survival” and “recovery” were distinct goals of the ESA, see Gifford, 378 F.3d at 1070. The Fifth Circuit reached the same conclusion in Sierra Club v. Fish & Wildlife Service, 245 F.3d 434, 441-42 (5th Cir. 2001), observing that “ ‘[conservation’ is a much broader concept than mere survival,” id. at 441; cf. New Mexico Cattle Growers Ass’n v. Fish & Wildlife Serv., 248 F.3d 1277, 1283 n. 2 (10th Cir.2001).
*452 Congress repeatedly referred in the ESA to “survival” as a separate status than “conservation” or “recovery.” See 16 U.S.C. §§ 1533(f)(1) & (f)(1)(B)© (mandating recovery plans for the “conservation and survival” of species); id. §§ 1535(c)(1) & (c)(2) (authorizing cooperative agreements with State agencies that have “an adequate and active program for conservation of endangered and threatened species,” id. §§ 1535(c)(1) & (c)(2), and are also authorized to “conduct investigations to determine the status and requirements for survival,” id. §§ 1535(c)(1)(C) & (c)(2)(C)); id. §§ 1535(d)(1)(B) & (E) (authorizing financial assistance to states based on the state’s capacity to “proceed with a conservation program” and the “urgency to initiate a program to restore and protect [a species] ... in terms of survival of the species”); § 1539(a)(2)(B)(iv) (permitting “taking” of species where, among other things, it “will not appreciably reduce the likelihood of the survival and recovery of the species”). From the statutory text, “it is clear that Congress intended that conservation and survival be two different (though complementary) goals of the ESA.” Gifford, 378 F.3d at 1070. The Secretary’s regulation on delisting, which provides that “[a] species may be delisted on the basis of recovery only if the best scientific and commercial data available indicate that it is no longer endangered or threatened,” 50 C.F.R. § 424.11(d)(2) (1984) (promulgated prior to the 1988 ESA Amendments), must be viewed in light of Congress’s distinction between “survival” and “recovery.” Consequently, the Secretary’s decision to delist the Squirrel on the basis of its “persistence” — that is, its bare survival — is a statutorily insufficient basis for delisting.[8]
In sum, contrary to Congress’s plain text, the court jettisons the protections in the ESA for endangered and threatened species and leaves the Secretary (and the FWS) more insulated and less informed than Congress contemplated in strengthening the ESA in 1988. The court’s approval of the FWS’s covert revisions to the Squirrel’s recovery plan, surprise introduction of a new recovery standard in the Final Rule, and adoption of a delisting standard unambiguously foreclosed by the ESA leaves little of the species’ protections Congress provided in the ESA, much less of APA requirements.
Accordingly, I respectfully dissent.

. Under Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778, the first step requires a determination of "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.”
The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.
Id. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). If, after applying traditional tools of statutory construction, the court determines "the statute is silent or ambiguous with respect to the specific issue," then, under step two, the court will defer to an agency's statutory interpretation if it "is based on a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778.

. See The Chicago Manual of Style ¶ 5.150 (16th ed. 2010) {"Would sometimes expresses a condition {I would slide down the hill if you lent me your sled}"). Likewise, here a species would be delisted when the recovery criteria are met.

. The Squirrel Recovery Plan lists four criteria to delist the Squirrel: (1) realization of "stable or expanding” populations over, a ten year period in 80% of the designated geographic recovery areas ("GRAs") (based on biennial sampling); (2) accumulation of "sufficient ecological data and timber management data ... to assure future protection and management”; (3) perpetual management of geographic recovery areas to ensure sufficient habitat and habitat corridors for migration; and (4) "existence of high elevation forests on which the [S]quirrel[] depend[s] is not itself threatened by introduced pests ... - or by environmental pollutants.” U.S. Fish & Wildlife Service, Appalachian Northern Flying Squirrels Recovery Plan 18 (Sept. 24, 1990) ("Recovery Plan”).

. The legislative history of the 1988 ESA Amendments confirms the conclusion that section 4(f)'s meaning is unambiguous. "[T]he Act is amended to require ... site-specific management actions to achieve recovery [and] criteria by which to judge success of the plan.... Incorporation of this information will ensure that plans are explicit as possible in describing the steps to be taken in the recovery of a species.” S. Rep. No. 100-240, at 9 (emphases added). "The requirement that plans contain objective, measurable criteria for removal of a species from the Act’s lists ... will provide a means by which to judge the progress being made toward recovery.” Id. at 9-10. The Secretary latches onto the word "a,” suggesting it implies other means by which to judge recovery progress. See Appellant's Br. at 32. This observation does not make the recovery plan's criteria any less mandatory, and the ESA requires a specific method for adopting those other criteria should the Secretary find it appropriate, see 16 U.S.C. § 1533(f)(4).
The notice-and-comment provision of section 4(f)(4) was an amendment offered by Senator McClure, who explained on the Senate floor that "this amendment will require the Secretary to solicit comments and additional information for consideration from local communities prior to final approval of new recovery plans, or before approval of revisions to existing plans.” 134 Cong. Rec. 19,270 (1988) (statement of Sen. Jim McClure) (emphases added). The amendment was not intended to make the Secretary "responsible for gathering the information. It [instead] allow[s] those most directly affected by a proposal to provide additional information to the Secretary that might otherwise be overlooked.” Id. The final Conference Report reflects the sponsor's view of the amendment: Although section 4(f)(4) "does not necessitate a rulemaking procedure,” it does "require[]” the Secretary to "consider the public comments before approving the plan.” H.R. Conf. Rep. No. 100-928, at 21(1988), reprinted in 1988 U.S.C.C.A.N. 2738, 2739 (emphasis added).

. The 2007 Analysis stated that the Secretary, acting through the FWS,
now know[s] that it is not practicable or necessary to measure actual [Squirrel] population numbers in GRAs. Sampling this widely dispersed, cryptic species is labor intensive and highly inefficient.... [The FWS] now considers persistence to be the best indicator of successfully reproducing populations for this subspecies. [The FWS] defines persistence as continuing captures of [Squirrels] over multiple (3-5) generations at previously documented sites throughout the historic range.
Id. at 1-2 (emphasis added). The FWS concluded, in view of this new criterion and nonpublic definition of "persistence,” that the “intent of this criterion [as revised] has been met.” Id. at 3.

. The 2007 Analysis stated that
the original goal of permanent habitat protection of a few small areas is no longer necessary. ... There are sufficient numbers of occurrences represented within the core areas such that the threat of a single or widespread catastrophic event eliminating a significant portion of occurrences is substantially reduced. Therefore not all of the GRAs need to be protected in perpetuity.
Id. at 5 (emphases added). The FWS concluded that “the intent of this recovery criterion has been met.” Id. at 10.

. See U.S. Fish & Wildlife Service, West Virginia Northern Flying Squirrel, 5-Year Review: Summary & Evaluation, App. B (Apr.2006); 16 U.S.C. § 1533(c)(2)(A).

. In view of the APA violations, it is unnecessary to address whether the FWS additionally failed adequately to explain the delisting conclusion by demonstrating a “rational connection between the facts found and the choice made,” Motor Vehicle Mfrs. Ass’n v. State Fann Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks and citation omitted). The capture data referenced in the Final Rule appear to show that only 36 of the 105 sites provide data (i.e., multiple captures over more than five years) of "persistence.” See 2006 5-Year Review, App. B.